## Case No. 7,825.

### Ex parte KINNEY.

[3 Hughes, 9; 3 Va. Law J. 370; 7 Reporter, 712.] [1]

Circuit Court, E. D. Virginia. May 14, 1879.

CITIZENSHIP — PRIVILEGES OF — FOURTEENTH AMENDMENT—MARRIAGE — STATE LAW PROHIBITING MISCEGENATION — WHETHER UNCONSTITUTIONAL.

1. There are two classes of privileges attaching to an American citizen, to wit: (1) those which he has as a citizen of the United States; and (2) those which he has as a citizen of the state where he resides as a member of society.

2. The fourteenth amendment of the United States constitution forbids the states from abridging the privileges belonging to a person as a citizen of the United States; but does not forbid the state from abridging the privileges belonging to their citizens as citizens of states.

3. Marriage is a privilege belonging to persons as members of society, and as citizens of the states in which they reside, and may be abridged at the will of the states in which they reside.

4. Marriage, though a contract, is more than a civil contract, and is not affected by the clause of the 10th section of 1st article of the consti-

1 [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission. 7 Reporter, 712, contains only a partial report.]

tution forbidding a state from passing any laws impairing the obligation of contracts.

5. A prisoner who has been prosecuted and imprisoned by his state for violating a law of his state relating to marriage, cannot be released by a United States court on habeas corpus, on the ground that such law violates the constitution or a law of the United States.

6. Section 1977 of the United States Revised Statutes, giving to all persons the same right of making and enforcing contracts as is enjoyed by white persons, only extends to lawful contracts, and does not extend to a marriage declared void by the law of the state of the parties to the marriage; and this, whether the ceremony of marriage was performed in that state or in another state, where such marriage was legal, if the parties to it go out of the state of their residence in order to evade her laws, and return to live and cohabit in the state in positive violation of her express law.

On petition praying that the writ of habeas corpus be addressed to Samuel A. Swann, superintendent of the penitentiary of Virginia, in whose custody the petitioner [Edmund Kinney] is detained.

Kinney's petition alleges that for five years he has been a resident of the county of Hanover in this state; that he is of the negro race; that he is confined in the Virginia penitentiary in violation of the constitution and laws of the United States; and prays for discharge from such confinement. The petition states that in October last petitioner and Mary S. Hall, a white woman, visited Washington, in the District of Columbia, and were there legally married; that they soon thereafter returned to Hanover county, and there lived together as man and wife; that they were subsequently arrested, tried and convicted by a state court for feloniously leaving the state of Virginia for the purpose of marrying, and for having married in the District of Columbia, and for having returned to this state and cohabited; that upon such conviction they were each sentenced to serve a term of five years at hard labor in the penitentiary, where they are now confined. Petitioner claims that a marriage lawful in the District of Columbia is lawful everywhere in the United States, enabling those so married to live together as man and wife in any part of the United States, and that any state law forbidding them to do so is contrary to the constitution and void.

L. L. Lewis, U. S. Atty., for petitioner.

James G. Field, Atty. Gen. of Virginia, for the Commonwealth of Virginia.

HUGHES, District Judge. The question presented by this petition involves so seriously the relations of the federal courts to the laws of the states and their administration by state tribunals, that I shall be excused for giving a carefully considered and painstaking explanation of the ground of my action in this matter. Leaving out of the text such words and clauses as have no application to the case, the following are the provisions of law relating to the jurisdiction of this court on the question of awarding a writ of habeas corpus on this petition:

Section 753 of the Revised Statutes of the United States provides that the writ of habeas corpus shall, in no case, extend to a prisoner in jail, unless (among other instances, of which this is not one) "where he is in custody in violation of the constitution or a law of the United States." Section 754 requires that the application for the writ shall be in writing, setting out the facts concerning the petitioner's detention, verified by affidavit; and section 755 authorizes the writ to issue, "unless it appears from the petition itself that the applicant is not entitled thereto." The writ, therefore, is not issued as a matter of course. Whether it shall go out or not depends upon the facts presented by the petition, showing whether or not the petitioner's detention in jail is in violation of the constitution or a law of the United States. If it appears from the petition itself that the constitution or a law of the United States has not been violated in the petitioner's arrest and imprisonment, then, of course, the writ must not go out. It is essential, therefore, to inquire whether, in the facts stated by the petition, the constitution or any law of the United States has been violated; and first, I will consider whether there has been a violation of the constitution.

It must not be forgotten that the federal courts are forbidden to issue the writ of habeas corpus in favor of a prisoner in jail under conviction of a state court, unless the petition itself makes a case for jurisdiction under section 753. I am to inquire whether the averments in this petition release me from that inhibition. I can imagine no subject on which the federal courts ought to be more considerate in assuming jurisdiction. The petitioner here is a negro man; but the question of issuing the writ does not turn upon any provision of the constitution relating particularly to race or color. It is only the fifteenth amendment which makes special mention of that subject, in providing that the right of a citizen of the United States to vote shall not be denied or abridged on account of race or color. No other provision relates particularly to the distinction of race or color. And as no question of voting is raised in this case, we have no concern with the fifteenth amendment. The question here is one of marrying, and there is nothing in the national constitution expressly forbidding a state from abridging the right of marrying, or indeed any right but that of voting, on account of race or color. The fifteenth amendment embodies the implication that a state may abridge any privileges of its citizens other than that of voting. No provision of the constitution relating particularly to the colored man as such has been violated by the state of Virginia in the prosecution, conviction, and imprisonment of this petitioner. If any constitutional provision has been violated at all, it is only some general provision relating to

the rights and privileges of citizens at large. Is it contended that the 1st section of the fourteenth amendment has been violated? That section declares that "all persons born in the United States are citizens of the United States and of the state wherein they reside," and provides that "no state shall make or enforce any law which shall abridge the privileges of citizens of the United States, nor deny to any person within its jurisdiction the equal protection of the laws." This section, after declaring that all persons born in the United States shall be citizens (1) of the United States and (2) of the state wherein they reside, goes on in the same sentence to provide that no state shall abridge the privileges of citizens of the United States; but does not go on to forbid a state from abridging the privileges of its own citizens. Leaving the matter of abridging the privileges of its own citizens to the discretion of each state, the section proceeds, in regard to the latter, only to provide that no state "shall deny to any person within its jurisdiction the equal protection of the laws." Thus it is seen that the fourteenth amendment itself classifies the privileges of citizens into those which they have as "citizens of the United States," and those which they have as "citizens of the state wherein they reside;" and this classification has been abundantly recognized, illustrated, and enforced by the supreme court of the United States in numerous decisions. See Trustees of Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 629; Gibbons v. Oden, 9 Wheat. [22 U. S.] 203; New York City v. Miln, 11 Pet. [36 U. S.] 133; Scott v. Sandford, 19 How. [60 U. S.] 404–406, 580; License Tax Cases, 5 Wall. [72 U. S.] 471; Paul v. Virginia, 8 Wall. [75 U. S.] 180; U. S. v. Witt, 9 Wall. [76 U. S.] 41; The Slaughter House Cases, 16 Wall. [83 U. S.] 36; U. S. v. Reese, 92 U. S. 214; and U. S. v. Cruikshank, Id. 542. See, also, Corfield v. Coryell [Case No. 3,230]; U. S. v. Petersburg Judges of Election [Id. 16,036]; and The Federalist, No. 45.

The rights which a person has as a citizen of a state are those which pertain to him as a member of society, and which would belong to him if his state were not a member of the American Union. Over these the states have the usual powers belonging to government; and these powers "extend to all objects, which, in the ordinary course of affairs, concern the lives, liberties (privileges), and properties of the people; and of the internal order, improvement, and prosperity of the state." The Federalist, No. 45. "The framers of the constitution did not intend to restrain the states in the regulation of their civil institutions, adopted for internal government, and the instrument they have given us is not to be so construed." Chief Justice Marshall, speaking specially of marriage, in the Dartmouth College Case, 4 Wheat. [17 U. S.] 629. Their powers extend, of course, to the control of the domestic relations of all classes of citizens of a state. On the other hand, the rights which a person has as a citizen of the United States are such as he has by virtue of his state being a member of the American Union under the provisions of our national constitution. For instance, a man is a citizen of a state by virtue of his being a native and resident there; but if he emigrates into another state he becomes at once a citizen there by operation of the provision of the constitution of the United States making him a citizen there; and he needs no special naturalization, which but for the constitution he would need to become such a citizen. Again, if a citizen of Virginia is allowed by her laws to carry on a business by paying a certain tax, a citizen of Maryland who comes into Virginia and pays the tax is entitled under the national constitution to carry on the same business in Virginia. The Virginian carries on the business here by right of his state citizenship; the Marylander carries it on here by right of his national citizenship. In the Slaughter House Cases [supra], the supreme court of the United States had under review an act of the legislature of Louisiana incorporating a company and conferring upon it the exclusive privilege of slaughtering animals within a defined area adjoining the city of New Orleans. Certain butchers of the vicinity, who were thus deprived of the privilege of exercising their trade in that area, assailed the charter as contrary to the provision of the fourteenth amendment of the national constitution quoted above. But the supreme court held that the privilege of butchering animals was of the class belonging to persons as citizens of their state, and not belonging to them as citizens of the United States. It therefore held that the legislative act abridging this right of the New Orleans butchers, and confining it exclusively to a favored corporation, did not violate the fourteenth amendment or any law passed under it, and could not be the subject of relief by a federal court, however unjust the state law.

In the light of this commentary, can it be intelligently contended that the laws of Virginia relating to marriage are obnoxious to the fourteenth amendment? These laws are as follows: The 9th section of chapter 104 of the Code of Virginia provides that "no man shall marry his mother, grandmother, stepmother, sister, daughter, granddaughter, half-sister, aunt, son's widow, wife's daughter or her grandmother or stepmother, brother's daughter or sister's daughter." The 10th section of the same chapter provides that no woman shall marry within degrees correlative with those defined in the 9th section. Among still other inhibitions of marriage, the same Code, in the 1st section of chapter 105, provides that "all marriages between a white person and a negro, and all marriages which are prohibited by law on account of either of the parties having a former wife or husband then living, shall be absolutely void, without any decree of divorce or other legal process."

The penal provisions are as follows: "If any person marry in violation of the 9th or 10th section of chapter 104 of the Code, he shall be confined in jail not more than six months, or fined not exceeding $500, at the discretion of the jury. Any white person who shall intermarry with a negro, or any negro who shall intermarry with a white person, shall be confined in the penitentiary not less than two nor more than five years." Crim. Rev. 1878, c. 8, §§ 3, 8.

It is clear that I am bound by the authorities which have been cited to treat the privilege of marriage as belonging to the class which a person has as a member of society, and not to the class which he has by virtue of the state in which he resides being a member of the American Union. If Virginia were in the midocean or on the antipodal continent, her control over the rights and privileges of her citizens as members of society, including marriage, would be, no more certainly than now, unrestrained by any provision of the national constitution. The right to enact as law any one of the three prohibitions of marriage which have been quoted from the Code, as between her own citizens residing within her own territory, is as clear as the right to make the other two. With the propriety, policy, or justice, of such laws a court of the United States has nothing to do. As individual citizens, their judges might possibly question the policy of such a state law, but as judicial officers they can only inquire what is the law. The fourteenth amendment gives no power to congress to interfere with the right of a state to regulate the domestic relations of its own citizens, and if a state enact such laws as those which have been quoted, the federal courts must respect them as they stand, without inquiring into the reasons of them. However harsh a state law may be, they can only say, with Ulpian, "Hoc quidem perquam durum est, sed ita lex scripta est." The clause of the fourteenth amendment under review makes a further distinction. After declaring that no state shall make any law which shall abridge the privileges of citizens of the United States, it adds: "Nor deny to any person within its jurisdiction the equal protection of the laws." Here is a distinction between citizens of the United States and "any persons," whether citizen or alien, residing or happening to be within the borders of a state. The declaratory clause forbids any abridgment of the rights of citizens of the United States. The remedial clause gives equal protection to all persons whatever while within a state's borders. The amendment does not provide that the privileges shall be equal, but it does provide that protection shall be equal. It establishes equality between all persons in their right to protection, but does not confer equality in the privileges they are to enjoy. It provides that whatever privileges the constitution and laws of the United States confer upon a citizen as a citizen of the United States shall be enjoyed without abridgment; and it provides that all persons within a state, whether a citizen of the United States, or of the states, or aliens, shall be equally protected by the laws in whatever privileges, whether equal or not equal, they may have from the United States or from the state. However unequal their privileges respectively, yet a foreigner, a citizen of another American state, and a citizen of the state, shall have the benefit equally in the state of all remedial laws for the recovery of rights, and of all legal safeguards ordained for the protection of life, liberty, and property.

I think it plain from this review that an equality of privileges is not enforced by the constitution upon a state in respect to its domestic laws, for the government of its own citizens as such, while they are within its jurisdiction. But even if it did require an equality of privileges, I do not see any discrimination against either race in a provision of law forbidding any white or colored person from marrying another of the opposite color of skin. If it forbids a colored person from marrying a white, it equally forbids a white person from marrying a colored. In its terms, and, for all I know, in its spirit, the law is a prohibition put upon both races alike and equally. In the present case, the white party to the marriage is in imprisonment as well as the colored person. I think it clear, therefore, that no provision of the fourteenth amendment has been violated by the state of Virginia in its prosecution of this petitioner. It would seem to follow from this conclusion that no act of congress passed to enforce that amendment is violated; and I know of none that can be claimed to have been, unless it be the first section of the civil rights act of 1866, now section 1977 of the Revised Statutes, which provides that "all persons within the jurisdiction of the United States shall have the same right in every state to make and enforce contracts as is enjoyed by white citizens, and shall be subject to like punishments," etc. As to punishments, I have just shown that the penalty of the state law is denounced equally and alike upon the white and colored persons who contract the illegal marriage with each other. As to rights, this is a law for the enforcement of that clause of the fourteenth amendment which requires a state to give the equal protection of the laws to all persons within its borders. All are permitted to make and enforce contracts; not, indeed, any sort of contracts which they may see fit to make, e. g., polygamous or incestuous contracts of marriage, or usurious contracts for money; but such contracts as are lawful. It is for a state and for congress, each within its respective sphere of constitutional authority, to say what shall be lawful contracts, and it is only such as are legal that can be made, and enforced within the state by "all persons within the jurisdiction of the United States." Provided the state law does not abridge a

right which a person has in his character of a citizen of the United States, of which marriage, as we have seen, is not one, the state may declare at will what contracts are and what are not legal within its jurisdiction, and section 1977 confers the right of enforcing only such contracts as are legal.

Congress has made no law relating to marriage. It has not, simply because it has no constitutional power to make laws affecting the domestic relations and regulating the social intercourse of the citizens of a state. If it were to make such a law for the states, that law would be unconstitutional, and the federal courts would not hesitate to declare it so. It is the state which is endowed with the sovereign power of making such laws, and therefore only those contracts of marriage that are legal under state laws can be enforced or enjoyed within the jurisdiction of the state. All this has been said on the hypothesis that the contract of marriage is subject, like pecuniary contracts, to the operation of section 1977. But marriage is more than a contract. It may be entered into at the will of competent parties, but it cannot, as other contracts may, be released at their will. Nor can its terms be shaped at their will; it cannot be for so many years and then cease, for it must be "until death us do part;" it cannot be entered into with one or more of the opposite sex at pleasure, but must be with one only, for the joint lives; it cannot be confined in effect to a single territorial jurisdiction, but has the same effect all over the world, so far as permitted by the law of each state or nation. It is plain, therefore, that marriage is not, in many of its qualities, of the class of contracts contemplated by section 1977 of the Revised Statutes; and in the Dartmouth College Case, 4 Wheat. [17 U. S.] 629, it was held by the supreme court of the United States that the clause of article 1, section 10, of the national constitution, forbidding a state from passing any law impairing "the obligation of contracts," does not embrace marriage, it never having been intended to forbid a state legislature to pass an act of divorce or an act conferring power upon state courts to grant decrees of divorce; the supreme court being of opinion that the contracts contemplated by the clause were only such as relate to property or pecuniary values. 1 Minor, Inst. 275. Thus we see, from another point of view, that marriage is not one of the "privileges" in regard to which the national constitution and congress can restrict the power of the states.

It is clear, on the whole, that section 1977 is not violated by the marriage laws of Virginia, and I know of no other act of congress that has been, considering the petitioner and his consort as citizens of Virginia, and treating their case as if the marriage had been entered into in this state. But this marriage was not entered into here. The parties to it went to the District of Columbia for the purpose of contracting it; did there contract it, and re-

turned to reside and cohabit together in this state. Yet this is not the case of citizens of another state, lawfully married in that domicile, afterward migrating thence in good faith into this state. If this petitioner had been born a citizen of the District of Columbia, and had there married a white woman in conformity to the laws of 'that jurisdiction, and had afterward migrated with his lawful wife to Virginia, and had been, after becoming thus domiciled here, prosecuted under that provision of the law of Virginia which has been quoted, and convicted and imprisoned, and had filed his petition here, praying for an inquiry into the cause of his detention in prison, the cause presented would have been essentially different from that actually under consideration. Then the question would have been whether such citizens of another state could claim here the protection of the 2d section of the 4th article of the national constitution. This section declares that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." At first blush it would seem that this provision would give a citizen of the District of Columbia, lawfully married as a citizen there, and afterward domiciliating here, the right to reside here under that marriage. But even in such a case the supreme court has decided otherwise. That such a citizen would have a right of transit with his wife through Virginia, and of temporary stoppage, and of carrying on any business here not requiring residence, may be conceded, because those are privileges following a citizen of the United States, as given by the section of the constitution just quoted, and by the clause of the fourteenth amendment previously considered. But it is equally true that such a citizen could not, by becoming a citizen of Virginia, bring here the privilege of exercising as such, a right legally enjoyed in the District but not given here. In the case of Paul v. Virginia, 8 Wall. [75 U. S.] 180, the supreme court of the United States held that "special privileges enjoyed by citizens in their own states are not secured to them in other states" by the provision of the 4th article of the constitution which has been quoted. Reviewing its decision in Bank of Augusta v. Earle, 13 Pet. [38 U. S.] 586, the court said that it was never intended by this provision to give to citizens from another state higher and greater privileges in any state than are enjoyed by citizens of that state; that it "was not intended by the provision to give to laws of one state any operation in other states; that they can have no such operation except by the permission, express or implied, of those states; and that the special privileges which they confer must be enjoyed at home, unless the assent of other states to their enjoyment therein be given." Pages 180, 181, 8 Wall. [75 U. S.]. The provision of the constitution in question refers to the privileges given in the state into which the citizen goes, and not to those given in the state from which he

comes. And so, even if this petitioner had been a citizen of another state, lawfully married there, and had come here bringing his wife, intending to live here in a condition of matrimony forbidden by our laws, he could not claim the protection of the national constitution, or of any law of congress in thus violating our laws. But the case of the petitioner is weaker than that just supposed. He and his consort were citizens of Virginia. They went abroad to be married in evasion of her laws, and they returned to cohabit together here in violation of them. The marriage certificate gives Virginia as the petitioner's residence, and his going to the District of Columbia was plainly an act in fraudem legis domesticae. The question whether a marriage illegal at home, and contracted in another place, to which the parties had gone in intentional evasion of the domestic law, should be treated as valid by the home state on their resuming residence within it has been much discussed by learned jurisconsults, such as Burge, Huber, Savigne, Pothier, Lord Mansfield, Lord Campbell, Lord Cranworth, Story, Kent, Wharton, and others, whose opinions have been divided. But the question thus discussed has supposed the non-existence of punitive law in the home state. It has been on the question whether the courts of the home state should, in the absence of statutory law, treat the marriage as valid in comity to the state where it was contracted; all writers conceding to the home state the power of adopting punitive laws forbidding the privilege of cohabitation at will. For I think I do not go too far when I assert it as a principle now well settled, that a "state may follow its citizens abroad and attach to acts done there the same consequences as if done at home; and that though the law of the place of a marriage may determine its forms and regularity, yet the law of the domicile of the parties must decide whether the contract was one which might be lawfully made;" and this unquestionably is the rule in regard to marriages polygamous, incestuous, and contrary to public policy. Our own court of appeals has so decided in Kinney v. Com., 2 Va. Law J. 632, following the English house of lords in the case of Brook v. Brook, 9 H. L. Cas. 193. So also have the supreme courts of North Carolina, South Carolina, and Louisiana, in Williams v. Oates, 5 Ired. 538; State v. Kennedy, 76 N. C. 251; State v. Ross, Id. 242, and Cent. Law J., April, 1877 [4 Cent. Law J. 392], and Dupre v. Boulard, 10 La. Ann. 411. But the supreme court of Massachusetts, in Medway v. Needham, 16 Mass. 157, and that of Kentucky, in Stevenson v. Gray, 17 B. Mon. 192, have decided contrariwise. The question can no longer be treated as open, however, in Virginia, whose legislature has recently, in the criminal revisal of March 14, 1878 (chapter 7, § 3), declared that: "If any person, resident in this state and within the degrees of relationship mentioned in the 9th and 10th sections of chapter 104 of the Code, or any white person and negro shall go out of the state for the purpose of being married, and with the intention of returning, and be married out of it, and afterward return to and reside in it, cohabiting as man and wife, they shall be as guilty, and be punished, as if the marriage had been in this state."

Now there are many illegal marriages other than those named in the foregoing penal section, of which, though illegal here, Virginia takes no notice if contracted without her jurisdiction. The ordinary "runaway matches" so frequent in this country, and those known as "Gretna Green" marriages in England, are not placed in either country under the ban of annulling or penal statutes, but, on the principle of interstate comity, are allowed to stand good. It is only marriages which are polygamous, incestuous, or contrary to public policy which are made the subject of penal enactments, such as that of the 3d section of chapter 7 of our Criminal Revision, just given. This petitioner is here, not as a citizen of the District of Columbia, to which he went to be married in evasion of the laws of Virginia, but as a citizen of Virginia amenable to her laws. He is here in that character only, and has brought back no other right in regard to the marriage which he made abroad than he took away. He cannot bring the marriage privileges of a citizen of the District of Columbia any more than he could those of a citizen of Utah, into Virginia, in violation of her laws. It was competent for the state of Virginia, so far as there is anything in the constitution and laws of the United States to prevent, to enact the law just quoted under which the petitioner was convicted, and, therefore, his case is beyond relief from a federal court. I know it is claimed that the provision of the 4th article of the national constitution, which requires each state to "give full faith and credit to the public acts, records, and judicial proceedings of the other states," has an important bearing on the present case. I have already abundantly shown that it cannot have the effect of making the laws of one state the laws of another. It is doubtful whether the marriage certificate of a clergyman or magistrate is a "public" record in the meaning of this provision of the constitution. But whether it be or not, the clause in question could only go to the extent of rendering indisputable the fact of the marriage and of its legality in the place of contract. To give to public records "full faith and credit, is to attribute to them positive and absolute verity, so that they cannot be contradicted, or the truth of them be denied any more than in the state where they originated." Story, Const. § 1310. "A court is bound to take judicial notice of the public records of another state." Owings v. Hull, 9 Pet. [34 U. S.] 627. "A judgment in one state is a judgment in another, only so far as to preclude inquiry as to the merits of the subject-matter of the original judgment."

McElmoyle v. Cohen, 13 Pet. [38 U. S.] 312. So that a money judgment obtained in the courts of another state is not a judgment here, but only a chose in action, requiring to be specially sued upon in this state. A public record certifying a marriage to have been legally contracted and valid there, though indisputable proof here of those two facts yet does not convert the fact of validity there into validity here, contrary to the express local law. It has never been pretended that the laws of a state can, by the acts of individuals, be subordinated within its own jurisdiction to the laws established by another state. A citizen of Virginia may go to the federal District of Columbia, or to the federal territory of Utah, and be married there in conformity to the local laws, and may remain there as a resident and citizen with impunity. But if his object in going was to evade the laws of Virginia, and if, after marriage, he returns here and remains in a condition of matrimony forbidden by our laws, the certificate of his marriage in the District or territory, in conformity to its laws, will have no other value here than as indisputable proof of his violation of our laws.

On the whole, I am of opinion that the law of Virginia, under which this petitioner is detained in prison by the state, does not violate the constitution or any law of the United States; and that I have, consequently, no jurisdiction to grant the relief for which the petitioner prays. The writ of habeas corpus is denied.