# Richmond

## HAM SAY NAIM v. RUBY ELAINE NAIM.

June 13, 1955.

Record No. 4368.

Present, All the Justices.

The opinion states the case.

*David Carliner* and *Stant & Mirman,* for the appellant.

*Bangel, Bangel & Bangel,* for the appellee.

*J. Lindsay Almond, Jr., Attorney General; C. F. Hicks, Assistant Attorney General* and *R. D. McIlwaine, III, Assistant Attorney General,* amici curiae.

BUCHANAN, J., delivered the opinion of the court.

This is an appeal from a decree of the court below holding the marriage between the appellant and the appellee to be void under § 20-54 of the Code of Virginia, 1950, which is part of "An ACT to preserve racial integrity," enacted by the General Assembly and approved March 20, 1924 (Acts 1924, ch. 371).

The material facts are not in dispute. The suit was brought by the appellee, who is a white person, duly domiciled in Virginia. The appellant is a Chinese and was a non-resident of the State at the time of the institution of the suit. On June 26, 1952, they left Virginia to be married in North Carolina. They were married in that State and immediately returned to Norfolk, Virginia, where they lived together as husband and wife. It is conceded that they left Virginia to be married in North Carolina for the purpose of evading the Virginia law which forbade their marriage.

The Virginia statute, § 20-54, in effect at the time of the marriage, is as follows:

"It shall hereafter be unlawful for any white person in this State to marry any save a white person, or a person with no other admixture of blood than white and American Indian. For the purpose of this chapter, the term 'white person' shall apply only to such person as has no trace whatever of any blood other than Caucasian; but persons who have one-sixteenth or less of the blood of the American Indian and have no other non-Caucasic blood shall be deemed to be white persons. All laws heretofore passed and now in effect regarding the intermarriage of white and colored persons shall apply to marriages prohibited by this chapter."

Virginia statutes regarding the intermarriage of white and colored persons in effect at the date of the marriage, and now in effect, provide that all marriages between a white person and a colored

person shall be absolutely void (§ 20-57); that if a white person and a colored person go out of the State for the purpose of being married and with the intention of returning, and after being married return and reside here, and cohabit as man and wife, they shall be punished as provided in § 20-59, and the marriage shall be governed by the same law as if it had been solemnized in this State. Section 20-59 provides that they shall be guilty of a felony and confined in the penitentiary for not less than one nor more than five years.*

As stated in appellant's brief, the only question at issue is whether the marriage of the appellant and appellee could be annulled on the ground of their racial ineligibility to marry one another.

The first assignment of error charges that the trial court was constitutionally without the power to annul the marriage on the basis of race; in other words, that the court did not have requisite potential jurisdiction. This argument seems to be in anticipation of a contention that was not made by the Commonwealth, which appears *amicus curiae*, the appellee not appearing on this appeal. We said in *Pretlow* v. *Pretlow*, 177 Va. 524, 548-9, 14 S. E. (2d) 381, 387, that "annulment rests within the inherent power of equity;" but of course if the Federal Constitutions forbids the enforcement of the statute under which the court acted, it likewise forbids the enforcement of the same prohibition by independent judicial action. "A State acts by its legislative, its executive or its judicial authorities. It can act in no other way." *Ex Parte Virginia*, 100 U. S. 339, 347, 25 L. ed. 676, 679. "The judicial act of the highest court of the state, in authoritatively construing and enforcing its laws, is the act of the state." *Twining* v. *New Jersey*, 211 U. S. 78, 29 S. Ct. 14, 53 L. ed. 97; *Shelley* v. *Kraemer*, 334 U. S. 1, 15, 68 S. Ct. 836, 842-3, 92 L. ed. 1161, 3 A. L. R. (2d) 441.

We need not linger over this first assignment because the remaining assignment of error presents the real issue—whether the statute in question is beyond the power of the State to enact under the Due Process and Equal Protection clauses of the Fourteenth Amendment.

Marriage, the appellant concedes, is subject to the control of the States. Nearly seventy years ago the Supreme Court said, and it

---

* Other sections of the Virginia Code prohibit marriages of persons within certain degrees of consanguinity and affinity, bigamist marriages, marriage of insane, epileptic or feeble-minded persons; of habitual criminals and of persons under a prescribed minimum age. Title 20, Chapter 3, Code 1950.

has said nothing to the contrary since: "Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the Legislature." *Maynard* v. *Hill*, 125 U. S. 190, 31 L. ed. 654, 657, 8 S. Ct. 723. And nine years before that: "Marriage, while from its very nature a sacred obligation, is, nevertheless, in most civilized nations, a civil contract, and usually regulated by law. Upon it society may be said to be built, and out of its fruits spring social relations and social obligations and duties, with which government is necessarily required to deal." *Reynolds* v. *United States*, 98 U. S. 145, 25 L. ed. 244, 250. That case was written by Chief Justice Waite, who said, in upholding a conviction of bigamy against a defense on the ground of the religious practice of polygamy authorized by the defendant's church, "it is impossible to believe that the constitutional guaranty of religious freedom was intended to prohibit legislation in respect to this most important feature of social life."

In the same year, 1878, it was written by this court, in *Kinney* v. *Commonwealth*, 71 Va. (30 Gratt.) 858, 862:

"There can be no doubt as to the power of every country to make laws regulating the marriage of its own subjects; to declare who may marry, how they may marry, and what shall be the legal consequences of their marrying. The right to regulate the institution of marriage; to classify the parties and persons who may lawfully marry; to dissolve the relation by divorce; and to impose such restraints upon the relation as the laws of God, and the laws of propriety, morality and social order demand, has been exercised by all civilized governments in all ages of the world." See also *Ex Parte Kinney*, 3 Hughes 1, 14 Fed. Cas. 602, 3 Va. Law J. 370.

More recently, in *Wood* v. *Commonwealth*, 159 Va. 963, 965, 166 S. E. 477, this court said "that the preservation of racial integrity is the unquestioned policy of this State, and that it is sound and wholesome, cannot be gainsaid." And in *Toler* v. *Oakwood &c. Corp.*, 173 Va. 425, 434, 4 S. E. (2d) 364, 368: "There can be no question of the public policy of Virginia with reference to miscegenation."

In *State* v. *Gibson*, 36 Ind. 389, 10 Am. Rep. 42, a statute prohibiting the intermarriage of negroes and white persons was held not to violate any provision of the Fourteenth Amendment or the Civil Rights laws. In the course of a well-reasoned and well-supported

discussion of the powers retained by and inherent in the States under the Constitution, the court said:

"* * In this State marriage is treated as a civil contract, but it is more than a mere civil contract. It is a public institution established by God himself, is recognized in all Christian and civilized nations, and is essential to the peace, happiness, and well-being of society. * * The right, in the states, to regulate and control, to guard, protect, and preserve this God-given, civilizing, and Christianizing institution is of inestimable importance, and cannot be surrendered, nor can the states suffer or permit any interference therewith. If the federal government can determine who may marry in a state, there is no limit to its power. * *." 36 Ind. at 402-3.

It was said in that case that the question was one of difference between the races, not of superiority or inferiority, and that the natural law which forbids their intermarriage and the social amalgamation which leads to a corruption of races is as clearly divine as that which imparted to them different natures.

In *Green* v. *State*, 58 Ala. 190, 29 Am. Rep. 739, the question was whether the State could make the marriage of a white person with a person of the colored race a punishable offense. The court held that the State had and retained that power; that while marriage was a contract, it was one of a peculiar character and subject to peculiar principles, the most interesting and important in its nature of any in society, and not embraced in the constitutional interdiction of legislative acts impairing the obligation of contracts. Manifestly, said the court, it is for the peace and happiness of the colored race, as well as of the white, that laws prohibiting intermarriage of the races should exist, and "How, then, can it be maintained that the States of this Union, in adopting amendments which make no allusion to such intermarriages, intended to deprive themselves of the important power of regulating matters of so great consequence and delicacy within their own borders for themselves, as it always was their undoubted right to do." 29 Am. Rep. at 743.

In 36 Am. Jur., Miscegenation, § 3, p. 452, it is said:

"In accordance with the power of every country to make laws regulating the marriage of its own subjects, to declare who may marry, how they may marry, and what shall be the legal consequences of their marrying, it is considered as well settled that although miscegenation statutes have been persistently attacked on the ground that they are violative of the United States Constitution,

they nevertheless constitute a proper exercise of the power of each state to control its own citizens. * *."

More than half of the States of the Union have miscegenation statutes. With only one exception they have been upheld in an unbroken line of decisions in every State in which it has been charged that they violate the Fourteenth Amendment: *State* v. *Pass*, 59 Ariz. 16, 121 P. (2d) 882; *Dodson* v. *State*, 61 Ark. 57, 31 S. W. 977; *Jackson* v. *Denver*, 109 Colo. 196, 124 P. (2d) 240; *Scott* v. *Georgia*, 39 Ga. 321; *State* v. *Jackson*, 80 Mo. 175, 50 Am. Rep. 499; *State* v. *Kennedy*, 76 N. C. 251, 22 Am. Rep. 683; *In Re Shun T. Takahashi's Estate*, 113 Mont. 490, 129 P. (2d) 217; *In Re Paquet's Estate*, 101 Ore. 393, 200 P. 911; *Lonas* v. *State*, 3 *Heiskell* (50 Tenn.) 287; *Frasher* v. *State*, 3 Tex. App. 263, 30 Am. Rep. 131.

The exception is California, where a divided court held to the contrary with three of the seven judges dissenting, in *Perez* v. *Sharp*, 32 Cal. (2d) 711, 198 P. (2d) 17 (sub nom. *Perez* v. *Lippold*). In one of the two concurring opinions it was pointed out that since California recognized a marriage performed in another State between persons of the white and colored races, such marriage could not be considered vitally detrimental to public health and morals, and that the California statutes forbidding miscegenetic marriages were distinguished from such statutes in other States in that they were entirely declaratory, while all the others carried with them punishments for violations, indicating an attitude of comparative indifference on the part of the California legislature and the absence of any clearly expressed sentiment or policy. However that may be, the holding is contrary to the otherwise uninterrupted course of judicial decision, both State and Federal, as pointed out in the dissenting opinion, with which we agree.

*Stevens* v. *United States*, 10 Cir., 146 F. (2d) 120, involved the validity of an Oklahoma statute which forbade the marriage of a person of African descent to any person not of such descent, or the marriage of any person not of African descent to a person of such descent, violation of which was punishable as a felony and the marriage declared in effect to be a nullity. The statute was challenged by the party of African descent on the ground that it violated the Fourteenth Amendment. The court held:

"* * Marriage is a consentient covenant. It is a contract in the sense that it is entered into by agreement of the parties. But it is more than a civil contract between them, subject to their will and

pleasure in respect of effects, continuance, or dissolution. It is a domestic relation having to do with the morals and civilization of a people. It is an essential institution in every well organized society. It affects in a vital manner public welfare, and its control and regulation is a matter of domestic concern within each state. A state has power to prescribe by law the age at which persons may enter into marriage, the procedure essential to constitute a valid marriage, the duties and obligations which it creates, and its effects upon the property rights of both parties. Maynard v. Hill, 125 U. S. 190, 8 S. Ct. 723, 31 L. Ed. 654. And within the range of permissible adoption of policies deemed to be promotive of the welfare of society as well as the individual members thereof, a state is empowered to forbid marriages between persons of African descent and persons of other races or descents. Such a statute does not contravene the Fourteenth Amendment. * *." 146 F. (2d) at 123.

From the *Slaughter-House Cases*, (1873), 16 Wall. (83 U. S.) 36, 21 L. ed. 394, to *Brown* v. *Board of Education*, (1954), 347 U. S. 483, 74 S. Ct. 686, 98 L. ed. 873, 38 A. L. R. (2d) 1180, and *Bolling* v. *Sharpe*, 347 U. S. 497, 74 S. Ct. 693, 98 L. ed. 884, the Supreme Court has made no decision at variance with the holding in the *Stevens* case. It has on numerous occasions invoked the provisions of the Fourteenth Amendment to invalidate State legislation and decision with respect to political and civil rights, but it has not denied to the States the right to deal with their social and domestic problems and to legislate in regard to the marriage relation. On the contrary, it has been at pains to exclude that relation from the effects of its holdings.

In *Pace* v. *Alabama*, 106 U. S. 583, 1 S. Ct. 637, 27 L. ed. 207, an Alabama statute provided that if a white person and a negro intermarried or lived in adultery or fornication with each other, they should be imprisoned in the penitentiary. Another statute provided smaller punishment for any man and woman who lived together in adultery or fornication. A white woman and Pace, a negro, were convicted under the first-mentioned statute and Pace appealed, claiming that the statute was in conflict with the Equal Protection clause of the Fourteenth Amendment. In affirming the conviction the court said: "Equality of protection under the laws implies not only accessibility by each one, whatever his race, on the same terms with others, to the courts of the country for the security of his person and property, but that in the administration of criminal

justice he shall not be subjected, for the same offense, to any greater or different punishment." It was held that there was no discrimination against either race in the statute; that "Whatever discrimination is made in the punishment prescribed in the two sections is directed against the offense designated and not against the person of any particular color or race. The punishment of each offending person, whether white or black, is the same."

In *Plessy* v. *Ferguson*, 163 U. S. 537, 16 S. Ct. 1138, 41 L. ed. 256, 259, the court said:

"Laws forbidding the intermarriage of the two races may be said in a technical sense to interfere with the freedom of contract, and yet have been universally recognized as within the police power of the state. * *."

Again in *Buchanan* v. *Warley*, 245 U. S. 60, 38 S. Ct. 16, 19, 20, 62 L. ed. 149, in speaking of the Civil Rights statutes enacted under the Thirteenth and Fourteenth Amendments, the court stated: "These enactments did not deal with the social rights of men, but with those fundamental rights in property which it was intended to secure upon the same terms to citizens of every race and color." And further: "The case presented does not deal with an attempt to prohibit the amalgamation of the races. The right which the ordinance annulled was the civil right of a white man to dispose of his property if he saw fit to do so to a person of color and of a colored person to make such disposition to a white person."

*Shelley* v. *Kraemer*, *supra*, likewise recognized the distinction between social legislation and the rights intended to be protected by the Fourteenth Amendment in these words:

"The historical context in which the Fourteenth Amendment became a part of the Constitution should not be forgotten. Whatever else the framers sought to achieve, it is clear that the matter of primary concern was the establishment of equality in the enjoyment of basic civil and political rights and the preservation of those rights from discriminatory action on the part of the States based on considerations of race or color. * *." 68 S. Ct. at 847.

*Brown* v. *Board of Education*, *supra*, reached its conclusion that segregation in the public schools was contrary to the Equal Protection clause on the basis that education is perhaps the most important function of State and local governments, "the very foundation of good citizenship," and that the opportunity to acquire it, "where the state has undertaken to provide it, is a right which must be made available to all on equal terms."

No such claim for the intermarriage of the races could be supported; by no sort of valid reasoning could it be found to be a foundation of good citizenship or a right which must be made available to all on equal terms. In the opinion of the legislatures of more than half the States it is harmful to good citizenship.

In the same tenor *Bolling* v. *Sharpe, supra,* pointed out that as long ago as 1896 the court declared the principle that the Constitution forbids, "so far as civil and political rights are concerned," discrimination against any citizen because of his race. In respect to the question of due process of law, the court said that "Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective."

It is the considered opinion of the people of more than half of the States of the Union that the prohibition against miscegenetic marriages is a proper governmental objective, and all the courts which so far have dealt with the question, with the one exception noted, have held that that is so.

As recently as November 22, 1954, the Supreme Court denied a petition for *certiorari* to the Court of Appeals of Alabama in the case of *Jackson* v. *State*, 37 Ala. App. 519, 72 So. (2d) 114, in which *certiorari* had likewise been denied by the Supreme Court of Alabama. 260 Ala. 698, 72 So. (2d) 116, 348 U. S. 888, 75 S. Ct. 210. In that case the appellant had been convicted under the Alabama miscegenation statute which made it a felony for any white person and any negro or the descendant of any negro to intermarry or live in adultery or fornication with each other. The conviction was affirmed against the contentions that the statute denied to the appellant, a negro, "her constitutional right and privilege of intermarrying with a white male person," and that it violated the Privileges and Immunities, the Due Process and the Equal Protection clauses of the Fourteenth Amendment.

■ If the prevention of miscegenetic marriages is a proper governmental objective, and within the competency of the State to effect, which we hold it to be, then § 20-54 of the Code, *supra,* under attack, is a valid enactment unless the classification made by the statute is arbitrary and without reasonable relation to the purpose intended to be effected. As was said in *Purity Extract &c. Co.* v. *Lynch*, 226 U. S. 192, 33 S. Ct. 44, 46, 47, 57 L. ed. 184: "It is also well established that, when a state exerting its recognized au-

thority, undertakes to suppress what it is free to regard as a public evil, it may adopt such measures having reasonable relation to that end as it may deem necessary in order to make its action effective." And again: "The inquiry must be whether, considering the end in view, the statute passes the bounds of reason and assumes the character of a merely arbitrary fiat."

The only way by which the statute could be made effective was by classification of the races. If preservation of racial integrity is legal, then racial classification to effect that end is not presumed to be arbitrary.

It does not appear from this record that the appellant questioned the reasonableness of the classification in the trial court. There is no evidence in the record suggesting that the classification made by the statute is unreasonable or that it is not reasonably related to the purpose intended to be accomplished. In the absence of all evidence to the contrary, the presumption of reasonableness is very strong.

"* * When the classification made by the legislature is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary. * *." *Borden's Farm Products Co.* v. *Baldwin*, 293 U. S. 194, 55 S. Ct. 187, 192, 79 L. ed. 281.

Such is the established rule in this Commonwealth as well as in all other jurisdictions. *Martin's Ex'rs* v. *Commonwealth*, 126 Va. 603, 102 S. E. 77; *Bowman* v. *Virginia State Entomologist*, 128 Va. 351, 105 S. E. 141; *Joy, et al.* v. *Green*, 194 Va. 1003, 76 S. E. (2d) 178; *Bray* v. *County Board*, 195 Va. 31, 77 S. E. (2d) 479; 12 Am. Jur., Constitutional Law, § 521, p. 214; 16 C. J. S., Constitutional Law, § 99, p. 250.

The institution of marriage has from time immemorial been considered a proper subject for State regulation in the interest of the public health, morals and welfare, to the end that family life, a relation basic and vital to the permanence of the State, may be maintained in accordance with established tradition and culture and in furtherance of the physical, moral and spiritual well-being of its citizens.

We are unable to read in the Fourteenth Amendment to the

Constitution, or in any other provision of that great document, any words or any intendment which prohibit the State from enacting legislation to preserve the racial integrity of its citizens, or which denies the power of the State to regulate the marriage relation so that it shall not have a mongrel breed of citizens. We find there no requirement that the State shall not legislate to prevent the obliteration of racial pride, but must permit the corruption of blood even though it weaken or destroy the quality of its citizenship. Both sacred and secular history teach that nations and races have better advanced in human progress when they cultivated their own distinctive characteristics and culture and developed their own peculiar genius.

Regulation of the marriage relation is, we think, distinctly one of the rights guaranteed to the States and safeguarded by that bastion of States' rights, somewhat battered perhaps but still a sturdy fortress in our fundamental law, the tenth section of the Bill of Rights, which declares: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

The decree appealed from is

*Affirmed.*