CHANDLER, Justice,
objecting to the order with separate written statement:
¶ 1. I disagree with the order for supplemental briefing. There seems no way, based on a plain reading of the applicable statutes and state constitutional provisions, to grant a divorce to Czekala-Chatham in this state without violating the statutes and the Mississippi Constitution. Mississippi Code Section 93-1-1(2) states that “[a]ny marriage between persons of the same gender is prohibited and null and void from the beginning. Any marriage between persons of the same gender that is valid in another jurisdiction does not constitute a legal or valid marriage in Mississippi.” Miss.Code Ann. § 93-1-1(2) (Rev.2013). Mississippi Code Section 93-1-3 provides that “[a]ny attempt to evade Section 93-1-1 by marrying out of this state and returning to it shall be within the prohibitions of said section.” Miss.Code Ann. § 93-1-3 (Rev.2013). And Section 263A of the Mississippi Constitution provides:
Marriage may take place and may be valid under the laws of this State only between a man and a woman. A marriage in another State or foreign jurisdiction between persons of the same gender, regardless of when the marriage took place, may not be recognized in this State and is void and unenforceable under the laws of this State.
Miss. Const, art. 14 § 263A.
¶2. In light of the plain language of these laws, further briefing on this subject, in my opinion, causes undue delay and wastes Czekala-Chatham’s resources, as well as the resources of the State of Mississippi. Without further opinion on the merits, I believe this Court should review the constitutional issues presented without additional briefing.
KING, Justice, Objecting to the order with Separate Written Statement:
¶ 3. This Court has ordered the parties in this case to submit supplemental briefs on the following question:
In light of Mississippi’s public policy of not allowing or recognizing a marriage between two persons of the same gender, what rational basis supports the interpretation or application of a law or constitutional provision so as to prohibit Mississippi courts from granting a divorce to a Mississippi resident who was lawfully married in another state to a person of the same gender?
I can determine no rational basis to believe that this Court will receive any substantial benefit from the required supplemental briefing.[1]
*789 ¶ 4. I do not claim to read the collective mind of this Court and its reasoning in requiring this supplemental briefing. But I can discern only one benefit accruing to this Court from this supplemental briefing. That benefit is pushing the responsibility for deciding a sensitive and highly emotional issue to the United States Supreme Court.[2] I am of the belief that such an action is contrary to the constitutional oath of office that Mississippi requires of its judiciary to “faithfully and impartially discharge” its duties “agreeably to the Constitution of the United States and the Constitution and laws of the State of Mississippi.” Miss. Const. art. 6, § 155 (emphasis added). Given that the pertinent issues are clearly before this Court, and that the statute and constitutional provision at issue are clearly unconstitutional, I see no reason for useless supplemental briefing or for delaying a decision to allow this couple their long-awaited divorce. Consequently, I object to the order for supplemental briefing and believe this Court should decide the squarely presented constitutional issue at hand.

FACTS AND PROCEDURAL HISTORY

¶ 5. On August 22, 2008, Lauren Beth Czekala-Chatham and Dana Ann Melan-con, both Mississippi residents at the time, were legally married in California. Czekala-Chatham and Melancon separated on July 30, 2010, in Southaven, Mississippi. On September 11, 2013, Czekala-Chatham, a resident of DeSoto County, Mississippi, filed for divorce in the Chancery Court of DeSoto County. Melancon filed a motion to dismiss, arguing that the chancery court could not recognize a same-sex marriage, thus could not grant a same-sex divorce, because her marriage to Czekala-Chatham was null and void in Mississippi. In response, Czekala-Chatham filed a “Combined Motion and Memorandum to Declare Mississippi Code Annotated § 93-1-1, § 93-1-3, and Mississippi Constitution Article XIV, § 263A, (2004) Unconstitutional.” She argued that these provisions are unconstitutional because Mississippi must give full faith and credit to the California marriage, because the provisions violate the right to travel, and because the provisions violate the Equal Protection Clause. She also argued that the Mississippi provisions violate the Privileges and Immunities Clause.
¶ 6. On November 15, 2013, the State of Mississippi, through the Attorney General, moved to intervene in the case. The State opposed Czekala-Chatham’s attempt to have Mississippi Code Sections 93-1-1 and 93-1-3 and Mississippi Constitution Article 14, Section 263A declared unconstitutional. The State argued that 1) Mississippi is not obligated to recognize a California same-sex marriage under the Full Faith and Credit Clause; 2) Mississippi’s marriage laws do not violate the right to travel; and 3) Mississippi’s marriage laws do not violate equal protection.
*790 ¶ 7. On November 25-26, 2013, Czeka-la-Chatham and Melancon entered into an “Agreement for the Settlement of Property Rights.” Czekala-Chatham and Melan-con then immediately filed a “Joint Motion to Withdraw All Contest” in which Melan-con withdrew her motion to dismiss and the parties requested to proceed on the ground of irreconcilable differences.
¶ 8. The chancery court held a hearing on the issue of the constitutionality of the statutes and constitutional provision on December 2, 2013. Because the parties had agreed on all other issues, the “only issue remaining [was] whether or not these statutory bans as applied to the parties prohibits a divorce from being entered by this Court.”
¶ 9. On December 6, 2013, the chancery court denied Czekala-Chatham’s motion to declare unconstitutional the Mississippi Code and Constitution provisions prohibiting same-sex marriage and the recognition thereof. The court consequently dismissed the divorce claims for lack of subject matter jurisdiction. Aggrieved, Cze-kala-Chatham appealed to this Court.
¶ 10. On appeal, she argues that Mississippi’s bans on same-sex marriage violate the Equal Protection Clause, the Due Process Clause, and the right to travel. She also argues that the trial court’s failure to recognize her legal out-of-state marriage violates the Full Faith and Credit Clause. The American Civil Liberties Union (ACLU) filed an amicus brief on behalf of Czekala-Chatham, in which it argued that heightened scrutiny, rather than rational basis review, should be applied to sexual orientation classifications.
¶ 11. The State argues that Supreme Court precedent forecloses review of this issue and requires this Court to uphold the same-sex marriage bans. It also argues that United States v. Windsor forecloses Czekala-Chatham’s arguments, because that case placed the authority to regulate marriage solidly with the states. United States v. Windsor, - U.S.-, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013). Moreover, it argues that, even if the Court reaches the question of whether the laws violate the Equal Protection Clause, the State has a rational basis for those laws, and they must be upheld. It responds to the ACLU brief by arguing that most courts have declined to apply heightened scrutiny to classifications based upon sexual orientation. Governor Phil Bryant filed an ami-cus brief on behalf of the State, and in it he argues that Windsor affirms Mississippi’s right to define marriage as it sees fit, that the Full Faith and Credit Clause does not require that Mississippi violate its own public policy, and that concepts of federalism support the view that Mississippi’s bans on same-sex marriage should be upheld.
¶ 12. This Court held en banc oral argument on January 21, 2015. Today, this Court orders supplemental briefing in the case.

ANALYSIS

1. Standard of Review

¶ 13. This Court reviews questions of law de novo. Freeman v. State, 121 So.3d 888, 895 (Miss.2013). This case presents only questions of law.

2, Mississippi Law

¶14. In 1997, Mississippi enacted a statute that provides that “[a]ny marriage between persons of the same gender is prohibited and null and void from the beginning. Any marriage between persons of the same gender that is valid in another jurisdiction does not constitute a legal or valid marriage in Mississippi.” Miss.Code Ann. § 93-1-1 (Rev.2013); 1997 Miss. Laws, ch. 301, § 1. Moreover, “[a]ny at *791 tempt to evade Section 93-1-1 by marrying out of this state and returning to it shall be within -the prohibitions of said section.” Miss.Code Ann. § 93-1-3 (Rev. 2013). In 2004, Mississippians voted to amend the Mississippi Constitution to prohibit same-sex marriage. The section is entitled “Marriage defined as only between a man and a woman,” and it states that
Marriage may take place and may be valid under the laws of this State only between a man and a woman. A marriage in another State or foreign jurisdiction between persons of the same gender, regardless of when the marriage took place, may not be recognized in this State and is void and unenforceable under the laws of this State.
Miss. Const, art. 14, § 263A.[3]
¶ 15. The order for supplemental briefing, which effectively takes the position that divorce from a same-sex marriage may be possible in Mississippi, seems to ignore the plain language of this constitutional provision. It states that “[a] marriage in another State or foreign jurisdiction between persons of the same gender, regardless of when the marriage took place, may not be recognized, in this State and is void and unenforceable under the laws of this State.” Miss. Const. art. 14, § 263A (emphases added). According to Section 263A, a same-sex marriage may not be recognized in this State. Mississippi recognizes two ways to dissolve a marriage, divorce and annulment. Miss.Code Ann. § 93-5-1 (Rev.2013); Miss.Code Ann. § 93-5-2 (Rev.2013); Miss.Code Ann. § 93-7-3 (Rev.2013). In order to obtain a divorce from a marriage, one first has to recognize that marriage; otherwise, any two strangers off the street could walk into a courthouse and file for a divorce. One cannot get to second base without first going to first base. The same rationale applies to annulment—a marriage must be recognized prior to authorizing an annulment of that marriage. Section 263A forbids recognizing same-sex marriages, or, in other words, forbids going to first base. Further, Section 263A provides that same-sex marriages are unenforceable under the laws of this State. The plain language of the constitutional provision gives no exceptions. Thus, same-sex marriages are unenforceable under the State’s laws governing the dissolution of a marriage. The plain language of Section 263A makes very clear that the only way to grant the couple at issue, or similarly situated couples, a divorce or an annulment is to hold that section’s ban on same-sex marriage, or the ban on the recognition thereof, unconstitutional. See Miss.Code Ann. § 93-5-1 (Rev.2013) (“Divorce from the bonds of matrimony may be decreed.... ”); Miss. Code Ann. § 93-5-2 (Rev.2013) (“Divorce from the bonds of matrimony may be granted.... ”); Miss.Code Ann. § 93-7-3 (Rev.2013) (“A marriage may be annulled for any one (1) of the following causes ....”) (emphases added). The supplemental briefing order addresses a nonissue and thus appears to be a delay’tactic.

3. Baker v. Nelson

¶ 16. As an initial matter, the State argues that Baker v. Nelson forecloses Czekala-Chatham’s argument that the *792 Mississippi same-sex marriage bans violate the Equal Protection and Due Process Clauses. In that case, the Minnesota Supreme Court heard a case in which two adult males applied for and were denied a marriage license. Baker v. Nelson, 291 Minn. 310, 191 N.W.2d 185, 185 (1971). They argued that a prohibition of same-sex marriage, inter alia, deprived them of due process and denied them equal protection of the laws. Id. at 186. The Minnesota Supreme Court found that a prohibition of same-sex marriages did not offend the Constitution. Id. at 186-87. The two men appealed to the United States Supreme Court, which issued a one-sentence opinion that stated “[t]he appeal is dismissed for want of a substantial federal question.” Baker v. Nelson, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972).
¶ 17. It is true that even a summary dismissal for want of a substantial federal question is a disposition on the merits and binds lower courts. Hicks v. Miranda, 422 U.S. 332, 343-44, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). However, lower courts are not bound when doctrinal developments indicate that the Supreme Court no longer “brand[s] a question as unsubstantial.” Id. at 344-45, 95 S.Ct. 2281. It is abundantly clear that both general Equal Protection jurisprudence and jurisprudence regarding discrimination against homosexuals have provided doctrinal developments that indicate that the Supreme Court no longer brands this question as unsubstantial. Since “deciding” Baker, the Supreme Court has expanded Equal Protection and found homosexuals deserving of protection against discrimination. See Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982); Mathews v. Lucas, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976); Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620,134 L.Ed.2d 855 (1996); Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003); United States v. Windsor, — U.S.-, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013).
¶ 18. Most notably, as previously mentioned, the Supreme Court recently granted certiorari to address these very issues. Rule 10 of the Rules of the Supreme Court of the United States states that certiorari must be granted only for “compelling reasons” and, in granting certiorari on a United States court of appeals decision, it considers the following factors:
a United States court of appeals has entered a decision in conflict with the decision of another United States court of appeals on the same important matter; has decided an important federal question in a way that conflicts with a decision by a state court of last resort; or has so far departed from the accepted and usual course of judicial proceedings, or sanctioned such a departure by a lower court, as to call for an exercise of this Court’s supervisory power....
U.S. Supreme Court R. 10(a). This appears the most powerful signal that the issues addressed in Baker are indeed substantial federal questions. See also Windsor, 133 S.Ct. at 2695-96 (addressing a federal question, finding that the Defense of Marriage Act’s discrimination against same-sex marriages violated the Fifth Amendment). Thus, the one-line summary dismissal in Baker v. Nelson no longer has precedential value. See also Baskin v. Bogan, 766 F.3d 648, 659-60 (7th Cir. 2014); Bostic v. Schaefer, 760 F.3d 352, 373-75 (4th Cir.2014); Windsor, 699 F.3d at 178-79; Kitchen v. Herbert, 755 F.3d 1193, 1204-08 (10th Cir.2014); Latta v. Otter, 771 F.3d 456 (9th Cir.2014) (“As any observer of the Supreme Court cannot help but realize, this case and others like it present not only substantial but pressing *793 federal questions.”); Campaign for Southern Equality v. Bryant, 64 F.Supp.3d 906, 918-20 (S.D.Miss.2014).

4. Equal Protection Clause

¶ 19. The Equal Protection Clause of the United States Constitution provides that no State may “deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const, amend. XIV. This “is essentially a direction that all persons similarly situated should be treated alike.” City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439, 106 5.Ct. 3249, 87 L.Ed.2d 313 (1986). “The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.” Id. at 440, 105 S.Ct. 3249. “[T]he Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.” Id. However, “when a statute classifies by race, al-ienage, or national origin,” the legislation is not presumed valid. Id. “These factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others.” Id. Furthermore, “such discrimination is unlikely to soon be rectified by legislative means;” thus, such “laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest.” Id. A court must also subject a law to strict scrutiny when it impinges “on personal rights protected by the Constitution.” Id. Falling somewhere between rational basis review and strict scrutiny is some form of heightened review in which a law must be substantially related to a legitimate or sufficiently important state interest in order to survive constitutional scrutiny. Id. at 441, 105 S.Ct. 3249. This heightened scrutiny has been used for gender classifications and for classifications based upon illegitimacy. Id. at 440-41, 105 S.Ct. 3249. The Supreme Court has rationalized that such characteristics “generally provide no sensible ground for differential treatment” because they bear no relation to a person’s ability to participate in and contribute to society and reflect outdated notions and prejudices. Id. Thus, courts should look to whether a group has experienced a history of discrimination or “‘been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities.’ ” Id. at 441, 105 S.Ct. 3249 (quoting Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976)).
a. Level of Scrutiny
¶ 20. The State and the Governor argue that rational basis review applies to bans on same-sex marriage and the recognition thereof. Czekala-Chatham and the ACLU argue that a level of heightened scrutiny applies. The United States Supreme Court has not settled this debate, and the federal courts are split. Furthermore, Czekala-Chatham argues that marriage is a fundamental right, thus the laws must be subjected to a heightened level of scrutiny. The ultimate resolution of these issues is not a necessary one, because Mississippi’s bans on same-sex marriage and the recognition of same-sex marriage fail even under a rational basis review.
b. Rational Basis Review of Mississippi’s Same-Sex Marriage Bans
¶21. Mississippi’s bans on same-sex marriage must be sustained under a rational basis review standard if the classification drawn is “rationally related to a legitimate state interest.” City of Cleburne, 473 U.S. at 440, 105 S.Ct. 3249. *794 Thus, two components must be met to satisfy rational basis review: 1) the State must espouse a legitimate interest, and 2) the classification must be rationally related to that interest.
¶22, The State first argues that the burden of proof is on Czekala-Chatham, and that Czekala-Chatham has the burden of negating every conceivable basis for supporting the Mississippi same-sex marriage bans. Czekala-Chatham has indeed offered arguments negating every basis the State could conceive of to justify the same-sex marriage bans, as Czekala-Chat-ham has put forth arguments that the laws banning same-sex marriage are irrational and arbitrary.
¶ 23. The State argues that Mississippi’s laws pass muster under rational basis review, justifying them with the responsible procreation theory, tradition, and a “wait and see” approach. It also argues that Windsor stands for the proposition that states control the definition of marriage.[4] It first argues that “opposite sex marriages frequently result in pregnancies and offspring, and the legal protections of marriage extend to those procreative unions to encourage their longevity,” thus “[sjanctioning only those marriages is a legitimate State interest.” (Emphasis added.) It concludes that “[ojpposite sex marriages promote stable family environments for the raising of a child by both their biological mother and father,” and that “the State has a legitimate and rational interest in domestic relations laws that promote having both a mother and a father in the home as role models.” First, the State’s argument misrepresents reality—the State does not sanction only procreative unions. Fertility is not a prerequisite for a marriage license in Mississippi. *795 See Miss.Code Ann. § 93-1-5 (Rev.2013). Mississippi issues marriage licenses to the elderly, those prohibited from conjugal relations due to incarceration, the infertile, and any number of other “miscreants,” including those who abuse children. Campaign for Southern Equality, 64 F.Supp.3d at 930-44. This is because the law recognizes that, not only is marriage about more than simply “the right to have sexual intercourse,” or about having positive role models in the home for children (which child abusers and other miscreants are not), it is about something more. Lawrence v. Texas, 539 U.S. 558, 567, 123 S.Ct. 2472, 2478, 156 L.Ed.2d 508 (2003); Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Thus, forbidding same-sex marriage for the purpose of encouraging responsible procreation and a stable home environment with good role models is irrational and underinclusive to the extreme.
¶ 24. This classification is also irrational in that it has utterly no bearing on achieving the state’s purported end, thus it is not “relevant to the achievement” of the state interest. See City of Cleburne, 473 U.S. at 440, 105 S.Ct. 3249. Banning same-sex marriage has not achieved the State’s supposed interest in encouraging responsible heterosexual procreation. In 1997, when the State first statutorily banned same-sex marriage, births to unmarried women made up forty-five percent of the births in Mississippi. In 2004, when the State amended its constitution to ban same-sex marriage, births to unmarried women made up forty-eight percent of births. In 2012, after same-sex marriage had been banned in Mississippi for a solid fifteen years, births to unmarried women constituted an astonishing fifty-five percent of the births in Mississippi. Kids Count Data Center, “Births to Unmarried Women,” available at http://datacenter.kidscount. org/data/tables/7-births-to-u nmarried-women# detailed/2/26/false/868,15,8/any/257,258 (last visited Feb. 24, 2015). It is fairly obvious that banning same-sex marriage is not a rational means of achieving the end of family stability or responsible procreation. Indeed, the State may certainly encourage heterosexual marriage, but it provides no explanation as to why forbidding same-sex marriage encourages heterosexual marriages. Is any rational person to believe that heterosexuals will refuse to get married or rush to get divorced simply because homosexuals can marry? Banning homosexual marriage has no relation whatsoever to encouraging responsible procreation, as homosexual marriage does not harm heterosexual marriage.
¶ 25. Furthermore,
[g]ay and lesbian couples can form stable family units just as well as opposite-sex couples. Gay and lesbian couples can also love and care for children just as well as opposite-sex couples. It makes no sense to exclude them from an institution that promotes stable families and strengthens children. If the purpose of State-recognized marriage is to protect families and children, then the State should expand marriage rights to gay and lesbian couples, not bar them from it.
Campaign for Southern Equality, 64 F.Supp.3d at 943. Additionally, “[gjiven the number of children in our State .., awaiting placement in a stable family environment, it is irresponsible to deny those children the shelter and enrichment that same-sex families can provide.” Id.
¶26, Secondly, the State claims that “traditional marriage is a known quantity ingrained in our laws and culture that has proven its enduring value, over thousands of years.” It argues that “[sjtate sanctioned same sex marriage remains a novel social experiment with unforeseeable but *796 potentially profound consequences. Mississippi’s cautious legislative approach to that novelty, like any other, is inherently rational.” The State’s “tradition” argument is without merit—“tradition” is not a legitimate state interest.
¶ 27. As the Seventh Circuit found, [t]radition per se has no positive or negative significance. There are good traditions, ... bad traditions that are historical realities such as cannibalism, foot-binding, and suttee, and traditions that from a public-policy standpoint are neither good nor bad.... Tradition per se therefore cannot be a lawful ground for discrimination—regardless of the age of the tradition.
Baskin, 766 F.3d at 667. For example, many aspects of “traditional marriage,” including those involving thousands of years of tradition, could not constitutionally be resurrected in this day and age. To illustrate, “traditional marriage” in Mississippi involved women as property, and a man could legally beat and rape his wife; indeed, a man could legally forcibly rape his wife with whom he was cohabitating in Mississippi until 1993. Bradley v. State, 1 Miss. 156 (1824) (“[L]et the husband be permitted to exercise the right of moderate chastisement, in cases of great emergency, and use salutary restraints in every case of misbehaviour, without being subjected to vexatious prosecutions, resulting in the mutual discredit and shame of all parties concerned.”); 1980 Miss. Laws ch. 450, § 3 (“A person is not guilty of [sexual battery] if the alleged victim is that person’s legal spouse and at the time of the alleged offense such person and the alleged victim are not separated and living apart.”); 1993 Miss. Laws ch. 469 (providing that a spouse could be guilty of sexual battery if the spouse engaged in forcible sexual penetration without the victim’s consent, effective March 27, 1993). Yet, no one could argue with any amount of intellectual credibility that the people of Mississippi could amend the State’s constitution to allow a man to rape or beat his wife and justify such an amendment as having a rational basis because it is “traditional.” But that is exactly what the State illogically argues now—that “traditions” may be made into law merely because they are historically “traditional.” Traditionally, Mississippi and other states also forbade interracial marriage, a position that could not now be justified by that “tradition.” Miss. Const. art. 14, § 263. Tradition may not trample rights, nor is it any sort of rational justification for legislation in and of itself.
¶ 28. The “wait and see” approach advocated by the State also fails to provide a rational basis for discrimination against homosexuals. Such a rationale was rejected as a justification for discrimination in Loving v. Virginia. Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). The State of Virginia argued that “while there is evidence on both sides of this question, when such a situation exist [sic] it is for the legislature to draw its conclusions and that these conclusions are entitled to wait and unless it can be clearly said that there is no debatable question that a statute of this type cannot be declared unconstitutional.” Oral Argument in Loving v. Virginia, available at htt p:// www.oyez.org/cases/1960-1969/1966/1966_ 395; (last visited Feb. 24, 2015) see also Brief and Appendix on Behalf of Appellee in Loving v. Virginia, 1967 WL 113931. In Loving, the state of Virginia spent much time and effort wringing its hands over the potential psychological effects of interracial marriage on the children produced of such a marriage. The Supreme Court rejected the notion that, simply because long-term effects on children were unknown, the state was justified in prohibiting the “novelty” of interracial marriage. *797 Additionally, the States’ regulation of marriage is subject to constitutional guarantees. United States v. Windsor, — U.S. -, 133 S.Ct. 2675, 2692, 186 L.Ed.2d 808 (2013). “[T]he judiciary does not defer to the voters’ decision to deprive others of constitutional rights.... The political process does not enforce individual constitutional rights. The judiciary does.” Campaign for Southern Equality, 64 F.Supp.3d at 945. “The Constitution cannot yield to the passions of the majority.” Id. at 946 n. 47. Indeed, “a poll released in 2011 suggested that ‘nearly half of our State’s majority political party thought interracial marriage should be unlawful.” Id. at 947 (second emphasis added).
If the passage of 50 years has had such a negligible impact on the public’s opinion of interracial marriage in the Deep South, it is difficult to see how gay and lesbian Mississippians can depend on the political process to provide them any timely relief. And while they wait and see how the political process will play out, their legal rights and those of their children will continue to be denied.
Id. at 947. Even the Mississippi Constitution recognizes that the voters may not violate the United States Constitution. It provides that the people of Mississippi may later amend their constitution, “[p]rovided, [s]uch change be not repugnant to the constitution of the United States.” Miss. Const. art. 3, § 6.
¶ 29. In United States v. Windsor, the Supreme Court found Section 3 of the Defense of Marriage Act (DOMA), a statute similar to Mississippi’s ban on same-sex marriage, unconstitutional under the Fifth Amendment, finding that it had no legitimate purpose. Windsor, — U.S. -, 133 S.Ct. 2675. The DOMA provision at issue defined “marriage” and “spouse” as used in federal statutes and regulations as opposite-sex partners only, excluding same-sex partners. Id. at 2683. The federal law was not as extreme as the Mississippi law is. However, it precluded same-sex spouses from the benefits and obligations provided by federal law. The Court noted that DOMA “seeks to injure” same sex spouses, and in doing so, violated “basic due process and equal protection principles.” Id. at 2693. “The Constitution’s guarantee of equality must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot justify disparate treatment of that group.” Id. (internal quotations omitted). It opined that “[t]he avowed purpose and practical effect of the law here in question are to impose a disadvantage, a separate status, and so a stigma.” Id. The Court found that the “essence” of DOMA was to interfere with the equal dignity of same-sex marriages, and that the history of DOMA’s enactment and its own text demonstrated that fact. Id. Indeed, “DOMA [wrote] inequality into the entire United States Code.” Id. at 2694. “The principal purpose [was] to impose inequality, not for other reasons like governmental efficiency.” Id. Furthermore, DOMA “humiliate[d] tens of thousands of children now being raised by same-sex couples,” as well as financially harmed those children. Id. at 2694-95. It concluded that “the principal purpose and the necessary effect of [DOMA] are to demean those persons who are in a lawful same-sex marriage.” Id. at 2695. “[N]o legitimate purpose overcomes the purpose and effect to disparage and to injure those whom the State, by its marriage laws, sought to protect in personhood and dignity.” Id. at 2696.
¶ 30. Windsor did recognize that “[t]he definition of marriage is the foundation of the State’s broader authority to regulate the subject of domestic relations with respect to the ‘[protection of offspring, property interests, and the enforcement of *798 marital responsibilities.’” Windsor, 133 S.Ct. at 2691 (quoting Williams v. North Carolina, 317 U.S. 287, 298, 63 S.Ct. 207, 214, 87 L.Ed. 279 (1942)). However, none of these legitimate interests—protecting offspring, protecting property interests, and enforcing marital obligations—is served by banning same-sex marriage. Instead, same-sex marriage bans actively frustrate these laudable goals by failing to protect the children of same-sex spouses, failing to protect the property interests of same-sex spouses, and allowing same-sex spouses to escape marital obligations and responsibilities. Moreover, Windsor specifically notes its applicability when the State uses its power in defining the marital relation in a way that confers upon a class “a dignity and status of immense import” in order the enhance “the recognition, dignity, and protection of the class in their own community.” Windsor, 133 S.Ct. at 2692. Mississippi does not use its power to define the marital relation in a way that confers dignity—it uses it to discriminate and demean. Or, as the Supreme Court put it in Windsor, Mississippi, like the federal government did, imposes restrictions and disabilities on a class of citizens. Id.
¶ 31. While it is true that Windsor examined state-sanctioned same-sex marriage, and noted the States’ power to regulate marriage, the basic premise that DOMA was passed with animus—with the intent to demean and injure—can also be attributed to the Mississippi bans. WHien the Legislature amended the Mississippi Code in 1997 to prohibit same-sex marriage, it did so on the heels of a Hawaiian case that insinuated that a right to same-sex marriage may exist, and on the heels of DOMA. Campaign for Southern, Equality, 64 F.Supp.3d at 914; Baehr v. Lewin, 74 Haw. 530, 852 P.2d 44 (1993); Pub.L. No. 104-199, 110 Stat. 2419 (1996). The Act was categorized as “Domestic Relations—Prohibition against Same-Sex Marriages” and described as “An act to amend Section 93—1—1, Mississippi Code of 1972, to prohibit homosexual marriages and to provide that homosexual marriages recognized in another state shall not be recognized in this state and shall be declared void in this state; and for related purposes.” 1997 Miss. Laws, ch. 301. The purpose of the 2004 constitutional amendment was “to provide that marriage may take place and may be valid under the laws of this State only between a man and a woman; to provide that a marriage in another state or foreign jurisdiction between persons of the same gender, regardless of when the marriage took place, may not be recognized in this State and is void and unenforceable under the laws of this State.” 2004 Miss. Laws, ch. 620. This amendment was proposed on the heels of a Massachusetts case legalizing same-sex marriage. Goodridge v. Dep’t of Public Health, 440 Mass. 309, 798 N.E.2d 941 (2003). The history and text of Mississippi’s bans on same-sex marriage make clear that these laws were enacted in order to injure and disparage homosexuals, by making them and them marriages inferior. Indeed, “the design, purpose, and effect of Mississippi’s same-sex marriage ban is to single out same-sex couples and ensure that they cannot marry in Mississippi or have their out-of-state marriages recognized in Mississippi.... And the effect of the bill was (and is) to label same-sex couples as different and lesser, demeaning their sexuality and humiliating their children.” Campaign for Southern Equality, 64 F.Supp.3d at *948. Furthermore, that the admitted public policy of the State is so strong that it requires refusal to recognize same-sex marriages even when lawful out of state and even for purposes of a divorce, when it recognizes other void marriages for at least some purposes (see in *799 fra), betrays that the true purpose of the same-sex marriage bans is animus.[5]
¶ 32. Thus, not only can the State articulate no legitimate purpose for these bans, as the purpose is clearly animus, the State also fails to show how the bans bear any relation whatsoever to its stated purpose of family stability. Thus, these bans clearly violate the Equal Protection Clause of the Fourteenth Amendment, and this Court should not hesitate to find them unconstitutional.
c. Out-of-State Marriages
¶ 33. Czekala-Chatham also argues that the State has no legitimate interest in refusing to recognize same-sex marriages legally entered into in other states. She notes that the State recognizes other marriages that are not otherwise valid for purposes of estate cases or divorce cases. See George v. George, 389 So.2d 1389 (Miss.1980) (recognizing a common-law marriage that was validly celebrated in Georgia for purposes of divorce, despite Mississippi’s failure to recognize common-law marriage in general); Miller v. Lucks, 203 Miss. 824, 36 So.2d 140 (948) (recognizing interracial marriage for purposes of estate case). Furthermore, even bigamous marriages and incestuous marriages, both void in Mississippi, are causes for divorce, thus parties may receive a divorce from the bonds of these void marriages. Miss. Code Ann. § 93-5-1 (Rev.2013) (“Divorces from the bonds of matrimony may be decreed to the injured party for any one or more of the following ... causes: .., Marriage to some other person at the time of the pretended marriage between the parties.... Either party may have a divorce if they are related to each other within the degrees of kindred between whom marriage is prohibited by law....”). She points to Windsor as support that no *800 legitimate state purpose exists by refusing to recognize same-sex marriages legal in the state where celebrated. Because Mississippi treats opposite-sex marriages that would be invalid if performed in Mississippi differently than it treats valid-where-performed same-sex marriages, it violates the Equal Protection Clause, as no rational basis exists for such treatment. The only rationale for treating these married same-sex couples differently is to express disapproval for these marriages, or in other words, animus. Based upon the above analysis of the statutes under rational basis review, Czekala-Chatham is correct— the State has no rational basis for treating married, same-sex couples differently than married, opposite-sex couples, who can divorce in Mississippi.
CONCLUSION
¶ 34. I can discern no legitimate purpose for ordering supplemental briefing, and, consequently, I object to doing so. The issue of the constitutionality of these bans is squarely before this Court, and ordering briefing on the issue of a divorce that the chancery court could not currently grant given the bans on recognition of same-sex marriage is merely a delay tactic. We should decide the issue before us and ultimately find the bans on same-sex marriage and the recognition thereof found in Mississippi Code Sections 93-1-1, 93-1-3, and the Mississippi Constitution article IV, Section 263A, unconstitutional, because, on the most basic level, Mississippi’s bans on same-sex marriage and its recognition violate the Equal Protection Clause under rational basis review. Not only are many of the interests advanced by the State illegitimate interests, even to the extent the State does espouse legitimate interests, banning same-sex marriage has absolutely no rational relation to any of those interests. It does not further them in any way, and the classification claiming to further those interests is based upon animus. On that basis alone,[6] this Court should reverse the trial court and remand the case, allowing Czekala-Chatham to proceed in her divorce action.
KITCHENS, J., JOINS THIS SEPARATE WRITTEN STATEMENT.

. The order for supplemental briefing also includes the following statement: “Both parties agreed that this matter should be stayed until an opinion issues from the United States Supreme Court.” A review of the argument record indicates that is not a completely accurate statement. It is accurate that counsel for the State unequivocally agreed to a stay of this action. However, the very last position taken by counsel for the Appellant was not *789 that he agreed to a stay, but rather than he would defer to this Court on the issue of a stay.

. On January 16, 2015, the United States Supreme Court granted certiorari in several same-sex marriage cases and limited the grant of certiorari to the following questions: “1) Does the Fourteenth Amendment require a state to license a marriage between two people of the same sex? 2) Does the Fourteenth Amendment require a state to recognize a marriage between two people of the same sex when their marriage was lawfully licensed and performed out-of-state?” Order List: 574 U.S., available at http://www. supremecourt.gov/orders/courtorders/011615 zr_f2q3.pdf (last visited February 23, 2015). The Supreme Court’s decision in these consolidated cases will likely, but not definitely, govern our resolution in this case.

. Ironically, this provision was inserted in the same location as the now-defunct provision that provided that "[t]he marriage of a white person with a negro or mulatto, or person who shall have one-eighth or more of negro blood, shall be unlawful and void.” Miss. Const, art. 14, § 263. This section of the Mississippi Constitution was repealed in 1987, despite having been deemed unconstitutional in 1967 by Loving v. Virginia. 1987 Miss. Laws ch. 672; Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

. Miscegenation statutes were justified on eerily similar grounds. See Loving v. Virginia, 388 U.S. 1, 5-12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Loving v. Commonwealth, 206 Va. 924, 147 S.E.2d 78, 82 (1966) (noting "that there is an overriding state interest in the institution of marriage”); Naim v. Naim, 197 Va. 80, 87 S.E.2d 749, 751-56 (1955) (upholding miscegenation laws) ("Marriage ... is subject to the control of the States.”) (The Supreme Court "has on numerous occasions invoked the provisions of the Fourteenth Amendment to invalidate State legislation and decision with respect to political and civil rights, but it has not denied to the States the right to deal with their social and domestic problems and to legislate in regard to the marriage relation. On the contrary, it has been at pains to exclude that relation from the effects of its holdings.”) ("The institution of marriage has from time immemorial been considered a proper subject for State regulation in the interest of the public health, morals and welfare, to the end that family life, a relation basic and vital to the permanence of the State, may be maintained in accordance with established tradition and culture and in furtherance of the physical, moral and spiritual well-being of its citizens.”); Jones v. Lorenzen, 441 P.2d 986 (Okla.1965); State v. Brown, 236 La. 562, 108 So.2d 233, 234 (1959) (“[M]arriage is a status controlled by the states[.]”) (The state has a legitimate interest "in preventing the propagation of half-breed children” because those children "have difficulty in being accepted by society, and there is no doubt that children in such a situation are burdened ... with ⅛ feeling of inferiority as to their status in the community that may affect their hearts- and minds in a way unlikely ever to be undone.’ ”); Frasher v. State, 3 Tex.App. 263 (1877) (stating that the proper place to change the law is the legislature, not the courts) (“It has always been the policy of this state to maintain separate marital relations between the whites and the blacks. It is useless for us to cite the different statutes on this subject, enacted from time to time, showing that the people of Texas are now, and have ever been, opposed to the intermixture of these races. Under the police power possessed by the states they undoubtedly, in our judgment, have the power to pass such laws. If the people of other states desire to have an intermixture of the white and black races, they have the right to adopt such a policy. When the Legislature of this state shall declare such a policy by positive enactment, we will enforce it; until this is done, we will not give such a policy our sanction.”).

. The history of animus against homosexuals in Mississippi even includes this Court holding homosexuality against litigants in its opinions. See White v. Thompson, 569 So.2d 1181 (Miss. 1990) (upholding removal of custody from mother and a grant of custody to grandparents based in part on mother's lesbian relationship, and upholding visitation restriction that mother must conduct her visitation outside the presence of her lesbian partner); Weigcmd v. Houghton, 730 So.2d 581 (Miss. 1999) (denying father’s request for modification of custody based on stepfather's assaults on mother of child and drunkenness in the presence of the child and mother’s eviction from her apartment, based partially on the father's homosexuality as a factor considered heavily in his "moral fitness”); Bowen v. Bowen, 688 So.2d 1374 (Miss.1997) (affirming chancellor's award of custody of one child to father, who allegedly contributed to rumors that mother was in a lesbian relationship, because of mere rumors, not evidence, that the mother was in a lesbian relationship; this Court affirmed, and quoted with authority, the chancellor’s ruling that “[t]he rumors that Jeremy has heard have hurt him .... there’s evidence that a child on the school bus told Jeremy that he heard that David had lost Linda to another woman. Which if there’s anything that will cut a child to the quick, I can’t imagine anything that would hurt a boy more for another child to tell him something like that unless he was to tell him that his father was homosexual. And I don’t know which would be worse,... And whether the relationship is true or not true, it’s still hurting these children. And I realize that anybody can go out anywhere and ... people can start rumors on anybody. And it’s a hard thing to overcome once it’s started. And I realize that. But in this case I think Linda could have and I think Linda should have done something to alleviate those rumors even if it was cutting off her relationship with Lynn.”); Plaxico v. Michael, 735 So.2d 1036 (Miss. 1999) (upholding trial court's dismissal of invasion of privacy claim in which ex-husband peeped into former wife’s bedroom window and took nude photographs of his wife’s lesbian lover, because the photos were taken to advance ex-husband’s custody case and his actions were deemed necessary to protect the welfare of his minor child, and thus the Court deemed his voyeuristic actions which invaded the lesbian lover’s privacy acceptable).

. I recognize that the failure to grant Czeka-la-Chatham a divorce may also violate other constitutional provisions; however, given the clear violation of the Equal Protection Clause, I do not feel it necessary to address any other potential violations.