SYKES, Circuit Judge,
with whom BAUER and KANNE, Circuit Judges, join, dissenting.
Any case heard by the full court is important. This one is momentous. All the *360 more reason to pay careful attention to the limits on the court’s role. The question before the en banc court is one of statutory interpretation. The majority deploys a judge-empowering, common-law decision method that leaves a great deal of room for judicial discretion. So does Judge Pos-ner in his concurrence. Neither is faithful to the statutory text, read fairly, as a reasonable person would have understood it when it was adopted. The result is a statutory amendment courtesy of unelected judges. Judge Posner admits this; he embraces and argues for this conception of judicial power. The majority does not, preferring instead to smuggle in the statutory amendment under cover of an aggressive reading of loosely related Supreme Court precedents. Either way, the result is the same: the circumvention of the legislative process by which the people govern themselves.
Respect for the constraints imposed on the judiciary by a system of written law must begin with fidelity to the traditional first principle of statutory interpretation: When a statute supplies the rule of decision, our role is to give effect to the enacted text, interpreting the statutory language as a reasonable person would have understood it at the time of enactment. We are not authorized to infuse the text with a new or unconventional meaning or to update it to respond to changed social, economic, or political conditions.
In a handful of statutory contexts, Congress has vested the federal courts with authority to consider and make new rules of law in the common-law way. The Sherman Act is the archetype of the so-called “common-law statutes,” but there are very few of these and Title VII is not one of them. Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO, 451 U.S. 77, 95-97, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981); id. at 98 n.42, 101 S.Ct. 1571. So our role is interpretive only; we lack the discretion to ascribe to Title VII a meaning it did not bear at its inception. Sitting en banc permits us to overturn our own precedents, but in a statutory case, we do not sit as a common-law court free to engage in “judicial interpretive updating,” as Judge Posner calls it,[1] or to do the same thing by pressing hard on tenuously related Supreme Court opinions, as the majority does.
Judicial statutory updating, whether overt or covert, cannot be reconciled with the constitutional design. The Constitution establishes a procedure for enacting and amending statutes: bicameralism and presentment. See U.S. Const, art. I, § 7. Needless to say, statutory amendments brought to you by the judiciary do not pass through this process. That is why a textualist decision method matters: When we assume the power to alter the original public meaning of a statute through the process of interpretation, we assume a power that is not ours. The Constitution assigns the power to make and amend statutory law to the elected representatives of the people. However welcome today’s decision might be as a policy matter, it comes at a great cost to representative self-government.
I
Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer “to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual ... because of such individual’s race, color, religion, sex, or national origin.” 42 U.S.C. § 2000e-2(a)(l). Sexual orientation is not on the list of forbidden categories of employment discrimination, *361 and we have long and consistently held that employment decisions based on a person’s sexual orientation do not classify people on the basis of sex and thus are not covered by Title VII’s prohibition of discrimination “because of sex.” Hamm v. Weyauwega Milk Prods., Inc., 332 F.3d 1058, 1062 (7th Cir. 2003); Spearman v. Ford Motor Co., 231 F.3d 1080, 1085 (7th Cir. 2000); Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc., 224 F.3d 701, 704 (7th Cir. 2000); Ulane v. E. Airlines, Inc., 742 F.2d 1081, 1085 (7th Cir. 1984). This interpretation has been stable for many decades and is broadly accepted; all circuits agree that sexual-orientation discrimination is a distinct form of discrimination and is not synonymous with sex discrimination. See Majority Op. at pp. 341-42 (collecting cases).
Today the court jettisons the prevailing interpretation and installs the polar opposite. Suddenly sexual-orientation discrimination is sex discrimination and thus is actionable under Title VII. What justification is offered for this radical change in a well-established, uniform interpretation of an important — indeed, transformational— statute? My colleagues take note of the Supreme Court’s “absence from the debate.” Id. at p. 342. What debate? There is no debate, at least not in the relevant sense. Our long-standing interpretation of Title VII is not an outlier. From the statute’s inception to the present day, the appellate courts have unanimously and repeatedly read the statute the same way, as my colleagues must and do acknowledge. Id. at pp. 341-42. The Supreme Court has had no need to weigh in, and the unanimity among the courts of appeals strongly suggests that our long-settled interpretation is correct.
Of course there is a robust debate on this subject in our culture, media, and politics. Attitudes about gay rights have dramatically shifted in the 53 years since the Civil Rights Act was adopted. Lambda Legal’s proposed new reading of Title VII — offered on behalf of plaintiff Kimberly Hively at the appellate stage of this litigation — has a strong foothold in current popular opinion.
This striking cultural change informs a case for legislative change and might eventually persuade the people’s representatives to amend the statute to implement a new public policy. But it does not bear on the sole inquiry properly before the en banc court: Is the prevailing interpretation of Title VII — that discrimination on the basis of sexual orientation is different in kind and not a form of sex discrimination — wrong as an original matter?
A
On that question Lambda Legal has not carried its burden of legal persuasion. To be clear, I agree with my colleagues that the proposed new interpretation is not necessarily incorrect simply because no one in the 1964 Congress that adopted Title VII intended or anticipated its application to sexual-orientation discrimination. The subjective intentions of the legislators do not matter. Statutory interpretation is an objective inquiry that looks for the meaning the statutory language conveyed to a reasonable person at the time of enactment. The objective meaning of the text is not delimited by what individual lawmakers specifically had in mind when they voted for the statute. The Supreme Court made this point clear in Oncale when it said that “statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.” Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Broadly worded *362 statutes are regularly applied to circumstances beyond the subjective contemplation of the lawmakers who adopted the text.
That much is uncontroversial. Indeed, it derives from a foundational rule-of-law principle:
[I]t is simply incompatible with democratic government, or indeed, even with fair government, to have the meaning of a law determined by what the lawgiver meant, rather than by what the lawgiver promulgated.... [Ours is a] government of laws, not of men. Men may intend what they will; but it is only the laws that they enact which bind us.
Antonin Scalia, A Matter of Interpretation: Federal Courts and the Law 17 (Amy Gutmann ed., 1997).
So as a matter of interpretive method, I agree with my colleagues that the scope of Title VII is not limited by the subjective intentions of the enacting legislators. Or as Chief Judge Wood puts it in her elegant opinion for the en banc majority, the expectations of the enacting legislators “cannot stand in the way of the provisions of the law that are on the books.”[2] Majority Op. at p. 345.
B
That is where our agreement ends. The en banc majority rests its new interpretation of sex discrimination on a thought experiment drawn from the “tried-and-true” comparative method of proof often used by plaintiffs in discrimination cases. Id. at p. 345. The majority also invokes Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), the Supreme Court’s historic decision striking down Virginia’s miscegenation laws under the Fourteenth Amendment’s Equal Protection Clause, as well as cases involving sex stereotyping, most prominently Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).
But the analysis must begin with the statutory text; it largely ends there too. Is it even remotely plausible that in 1964, when Title VII was adopted, a reasonable person competent in the English language would have understood that a law banning employment discrimination “because of sex” also banned discrimination because of sexual orientation? The answer is no, of course not.
“It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.” Sandifer v. U.S. Steel Corp., — U.S. -, 134 S.Ct. 870, 876, 187 L.Ed.2d 729 (2014) (internal quotation marks omitted). The word “contemporary” as used here means contemporaneous with the statute’s enactment, not “contemporary” as in “now.” Id. at 876-77; see also Jackson v. Blitt & Gaines, P.C., 833 F.3d 860, 863 (7th Cir. 2016) (citing Sandifer and explaining that statutory interpretation “look[s] to the meaning of the word[s] at the time the statute was enacted”). The interpretive inquiry looks to the original public meaning of the statutory text.
Title VTI does not define discrimination “because of sex.” In common, ordinary usage in 1964 — and now, for that matter— the word “sex” means biologically male or female; it does not also refer to sexual orientation. See, e.g., Sex, The American Heritage Dictionary of the English Language (1st ed. 1969) (defining “sex” as “[t]he property or quality by which organ *363 isms are classified according to their reproductive functions[;] [e]ither of two divisions, designated male and female, of this classification”); Sex, New Oxford American Dictionary (3d ed. 2010) (defining “sex” as “either of the two main categories (male and female) into which humans and many other living things are divided on the basis of their reproductive functions”); Sex, The American Heritage Desk Dictionary (5th ed. 2013) (defining “sex” as “[e]ither of the two divisions, female and male, by which most organisms are classified on the basis of their reproductive organs and ' functions]);] [t]he condition or character of being female or male”).
To a fluent speaker of the English language — then and now — the ordinary meaning of the word “sex” does not fairly include the concept of “sexual orientation.” [3] The two terms are never used interchangeably, and the latter is not subsumed within the former; there is no overlap in meaning. Contrary to the majority’s vivid rhetorical claim, it does not take “considerable calisthenics” to separate the two. Majority Op. at p. 350. The words plainly describe different traits, and the separate and distinct meaning of each term is easily grasped. More specifically to the point here, discrimination “because of sex” is not reasonably understood to include discrimination based on sexual orientation, a different immutable characteristic. Classifying people by sexual orientation is different than classifying them by sex. The two traits are categorically distinct and widely recognized as such. There is no ambiguity or vagueness here.
Accordingly, as we said more than three decades ago in Ulane, Title VII’s prohibition of discrimination “because of sex” makes it unlawful for an employer “to discriminate against women because they are women and against men because they are men.” 742 F.2d at 1085. Because sexual-orientation discrimination is not synonymous with sex discrimination in ordinary usage, Title VII does not prohibit sexual-orientation discrimination. Not expressly (obviously), and not by fair implication either.
C
This commonsense understanding is confirmed by the language Congress uses when it does legislate against sexual-orientation discrimination. For example, the Violence Against Women Act prohibits funded programs and activities from discriminating “on the basis of actual or perceived race, color, religion, national origin, sex, gender identity, ... sexual orientation, or disability.” 42 U.S.C. § 13925(b)(13)(A) (emphases added). If sex discrimination is commonly understood to encompass sexual-orientation discrimination, then listing the two categories separately, as this statute does, is needless surplusage. The federal Hate Crimes Act is another example. It imposes a heightened punishment for causing or attempting to cause bodily injury “to any person, because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person.” 18 U.S.C. § 249(a)(2)(A) (emphases added).[4]
*364 Other examples can be found elsewhere in the U.S. Code. See, e.g., 42 U.S.C. § 3716(a)(1)(C) (providing federal assistance to state and local authorities for the investigation and prosecution of certain crimes “motivated by prejudice based on the actual or perceived race, color, religion, national origin, gender, sexual orientation, gender identity, or disability of the victim”) (emphases added); 20 U.S.C. § 1092(f)(l)(F)(ii) (requiring colleges and universities to collect and report information regarding crimes on campus, including “crimes involving bodily injury to any person, in which the victim is intentionally selected because of the actual or perceived race, gender, religion, national origin, sexual orientation, gender identity, ethnicity, or disability of the victim”) (emphases added); 42 U.S.C. 294e-l(b)(2) (requiring applicants for a federal mental-health education-grant program to demonstrate participation “of individuals and groups from different racial, ethnic, cultural, geographic, religious, linguistic, and class backgrounds, and different genders and sexual orientations”) (emphases added).
State and local antidiscrimination laws likewise distinguish between sex discrimination and sexual-orientation discrimination by listing them separately as distinct forms of unlawful discrimination. See, e.g., Illinois Human Rights Act, 775 III. Comp. Stat. 5/l-103(Q) (defining “unlawful discrimination” as “discrimination against a person because of his or her race, color, religion, national origin, ancestry, age, sex, marital status, order of protection status, disability, military status, sexual orientation, pregnancy, or unfavorable discharge from military service”) (emphases added); Iowa Civil Rights Act, Iowa Code § 216.7(l)(a) (prohibiting discrimination in public accommodations “because of race, creed, color, sex, sexual orientation, gender identity, national origin, religion, or disability”) (emphases added); Wis. Stat. § 106.52(3) (using similar language to prohibit discrimination in public accommodations); Minnesota Human Rights Act, Minn. Stat. § 363A.ll(l)(a)(l) (same); Or. Rev. Stat. § 659A.403(1) (same); Washington Civil Rights Act, Wash. Rev. Code § 49.60.030(1) (declaring as a civil right the “right to be free from discrimination because of race, creed, color, national origin, sex, honorably discharged veteran or military status, sexual orientation, or the presence of any ... disability”) (emphases added); D.C. Code § 2-1402.31(a) (forbidding certain forms of discrimination “based on the actual or perceived: race, color, religion, national origin, sex, age, ... [or] sexual orientation ... of any individual”) (emphases added); Bloomington, Ind., Code § 2.21.030(10) (defining a “discriminatory practice” as “the exclusion of a person by another person from equal opportunities because of race, religion, color, sex, national origin, ancestry, sexual orientation, gender identity, disability, housing status or status as a veteran”) (emphases added); Indianapolis, Ind., Code § 581-101 (defining prohibited “discriminatory practices” to include denying employment and educational opportunity, access to public accommodations, and acquisition of real estate “based on race, color, religion, ancestry, age, national origin, disability, sex, sexual orientation, gender identity, or United States military service veteran status”) (emphases added).
I could go on, but the point has been made. This uniformity of usage is powerful objective evidence that sexual-orientation discrimination is broadly recognized as an *365 independent category of discrimination and is not synonymous with sex discrimination.
II
My colleagues in the majority superficially acknowledge Ulane’s “truism” that sex discrimination is discrimination based on a person’s biological sex. Majority Op. at p. 341. As they see it, however, even if sex discrimination is understood in the ordinary way, sexual-orientation discrimination is sex discrimination because “it is actually impossible to discriminate on the basis of sexual orientation without discriminating on the basis of sex.” Id. at p. 351.
Not true. An employer who refuses to hire homosexuals is not drawing a line based on the job applicant’s sex. He is not excluding gay men because they are men and lesbians because they are women. His discriminatory motivation is independent of and unrelated to the applicant’s sex. Sexism (misandry and misogyny) and homophobia are separate kinds of prejudice that classify people in distinct ways based on different immutable characteristics. Simply put, sexual-orientation discrimination doesn’t classify people by sex; it doesn’t draw male/female distinctions but instead targets homosexual men and women for harsher treatment than heterosexual men and women.
The majority opinion merges these two distinct categories of discrimination by misapplying the comparative method of proof often used by plaintiffs in discrimination cases. As a threshold matter, it’s important to note that as used here, the comparative method is not serving its usual and intended purpose; it is not invoked as a method of proof or a technique for evaluating the sufficiency of the plaintiffs allegations or evidence. That’s because Hively has not, of course, raised a claim of sex discrimination. She does not allege that Ivy Tech refused to promote her to full-time professor and canceled her part-time teaching contract because of her sex; she does not claim that she was treated differently than a similarly situated man. She alleges that Ivy Tech took these adverse actions against her because she is a lesbian, not because she is a woman. So the majority’s discussion of what Hively “alleges,” id. at p. 345, followed by an incantation of the Rule 12(b)(6) standard for evaluating the sufficiency of the plaintiffs factual allegations (“[w]e take the facts in the light most favorable to her”), id. is seriously misleading.
This appeal has nothing to do with Hively’s factual allegations. We have only a legal question about the meaning of Title VII. Lambda Legal is advancing a creative new legal argument for reinterpreting Title VII, deploying the comparative method not as a method of proof (its normal and intended function) but as a thought experiment with the end of imbuing the statute with a new meaning that it did not bear at its inception.
This highlights a deeper problem with the court’s comparative analysis. The purpose of the comparative method is to isolate whether a statutorily forbidden motivation is at work as a factual matter — in a sex-discrimination case, to isolate whether the defendant employer took a particular adverse employment action against a particular female employee because she is a woman or against a particular male employee because he is a man. Title VII’s “intentional discrimination provision prohibits certain motives” for taking adverse job actions, EEOC v. Abercrombie & Fitch Stores, Inc., — U.S. -, 135 S.Ct. 2028, 2033, 192 L.Ed.2d 35 (2015), so as a required factual element of the claim, the plaintiff must prove that the employer actually acted with the intent or motive to discriminate on the basis of a statutorily *366 protected trait when he made the employment decision in question, Ricci v. DeStefano, 557 U.S. 557, 577, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) (citing Watson v. Fort Worth, Bank & Tr., 487 U.S. 977, 986, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)).
The comparative method of proof is a useful technique for uncovering the employer’s real motive for taking the challenged action. Comparing the plaintiff to a similarly situated employee of the opposite sex can help the fact finder determine whether the employer was actually motivated by the plaintiffs sex or acted for some other reason. It’s a device for ferreting out a prohibited discriminatory motive as an actual cause of the adverse employment action; it does this by controlling for other possible motives. If a female plaintiff can point to a male employee who is identical to her in every material respect and was treated more favorably, then the fact finder can draw an inference that the unfavorable treatment was actually motivated by the plaintiff’s sex.
Here the majority is not using the comparative method to isolate whether Ivy Tech was actually motivated by Hively’s sex when it refused to promote her to full-time professor and canceled her part-time teaching contract. To repeat, Hively does not make that allegation. Her factual claim is that Ivy Tech refused to promote her and canceled her contract because she is a lesbian. The only question for us is whether that claim — her real claim — is actionable under Title VII as a matter of law. That’s a pure question of statutory interpretation.
But the comparative method of proof is an evidentiary test; it is not an interpretive tool. It tells us nothing about the meaning or scope of Title VII. In ordinary English usage, sexual-orientation discrimination is a distinct form of discrimination and is not synonymous with, sex discrimination. That’s the plain meaning of Title VII’s text as originally understood. An evidentiary test like the comparative method of proof has no work to do here and is utterly out of place.
Moreover, the majority distorts the comparative method by opportunistically framing the comparison. If the aim is to isolate actual discriminatory motive based on the plaintiff’s sex, then we must hold everything constant except the plaintiff’s sex. But my colleagues load the dice by changing two variables — the plaintiffs sex and sexual orientation — to arrive at' the hypothetical comparator. The court’s reasoning essentially distills to this: If we compare Hively, a homosexual woman, to hypothetical Professor A, a heterosexual man, we can see that Ivy Tech is actually disadvantaging Hively because she is a woman. Majority Op. at pp. 345-46.
As a test for isolating an actual case of sex discrimination, that way of framing the comparative question doesn’t do the trick. Simply put, the comparison can’t do its job of ruling in sex discrimination as the actual reason for the employer’s decision (by ruling out other possible motivations) if we’re not scrupulous about holding everything constant except the plaintiff’s sex. That includes the plaintiffs sexual orientation. If we’re really serious about trying to isolate whether sex discrimination played a role in a specific employment decision, the test must exclude other factors that may have been decisive.
For the comparison to be valid as a test for the role of sex discrimination in this employment decision, the proper comparison is to ask how Ivy Tech treated qualified gay men. If an employer is willing to hire gay men but not lesbians, then the comparative method has exposed an actual case of sex discrimination. If, on the other hand, an employer hires only heterosexual men and women and rejects all homosexu *367 al applicants, then no inference of sex discrimination is possible, though we could perhaps draw an inference of sexual-orientation discrimination.
But of course my colleagues are not actually trying to isolate sex discrimination as the real motivation for Ivy Tech’s decision. They are not, that is, testing for a true case of sex discrimination. They are using the comparative method as a rhetorical device to conjure an entirely new understanding of the term “sex discrimination” for use in the Title VII context, one that denies the reality that sex and sexual orientation are different traits and that classifying people by sexual orientation is not the same as classifying them by sex. This is artifice, not interpretation.
My colleagues insist that “[t]he virtue of looking at comparators ... is that this process sheds light on the interpretive question raised by Hively’s case: is sexual-orientation discrimination a form of sex discrimination, given the way in which the Supreme Court has interpreted the word ‘sex’ in the statute?” Majority Op. at p. 347. I have two responses. First, at the risk of repeating myself, the point of “looking at comparators” in Title VII cases is to see if the evidentiary record permits a factual inference o'f actual discriminatory motive; the comparative method has no interpretive function. Second, the Supreme Court has never deployed an abstract version of the comparative method of proof to illuminate the original meaning or scope of Title VII, nor has it even hinted that such an abstraction is a proper interpretive tool. For good reason. Ordinary people do not use abstract thought experiments to ascribe meaning to texts.[5]
Ill
A
The majority also draws on Loving, the Supreme Court’s iconic decision invalidating Virginia’s miscegenation statutes on equal-protection grounds. This case is not a variant of Loving. Miscegenation laws plainly employ invidious racial classifications; they are inherently racially discriminatory. In contrast, sexual-orientation discrimination springs from a wholly different kind of bias than sex discrimination. The two forms of discrimination classify people based on different traits and thus are not the same.
In Loving, Virginia tried to defend its antimiscegenation regime by insisting that miscegenation statutes do not actually discriminate based on race because both the black and white spouses in an interracial *368 marriage are punished equally. 388 U.S. at 8, 87 S.Ct. 1817 (“[T]he State contends that, because its miscegenation statutes punish equally both the white and the Negro participants in an interracial marriage, these statutes, despite their reliance on racial classifications!!,] do not constitute an invidious discrimination based upon race.”). The Supreme Court made short work of that specious argument: “[W]e deal [here] with statutes containing racial classifications, and the fact of equal application does not immunize the statute[s] from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race.” Id. at 9, 87 S.Ct. 1817.
The Court went on to explain that the “clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States.” Id. at 10, 87 5.Ct. 1817. The Court continued with this: “There can be no question but that Virginia’s miscegenation statutes rest solely upon distinctions drawn according to race. The statutes proscribe generally accepted conduct if engaged in by members of different races.” Id. at 11, 87 S.Ct. 1817. After explaining that the “[penalties for miscegenation arose as an incident to slavery,” id. at 6, 87 S.Ct. 1817, and are “designed to maintain White Supremacy,”[6] id. at 11, 87 S.Ct. 1817, the Court announced its holding: “There can be no doubt that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause,” id. at 12, 87 S.Ct. 1817.
As these passages from the Court’s opinion make clear, Loving rests on the inescapable truth that miscegenation laws are inherently racist. They are premised on invidious ideas about white superiority and use racial classifications toward the end of racial purity and white supremacy. Sexual-orientation discrimination, on the other hand, is not inherently sexist. No one argues that sexual-orientation discrimination aims to promote or perpetuate the supremacy of one sex. In short, Loving neither compels nor supports the majority’s decision to upend the long-settled understanding that sex discrimination and sexual-orientation discrimination are distinct.
For the same reason, the majority’s reliance on Parr, Holcomb, and Drake, which translated Loving to the Title VII context, is entirely inapt. An employer who refuses to hire or fires an employee based on his interracial marriage is obviously drawing invidious racial classifications akin to those inherent in Virginia’s miscegenation laws. Loving's equal-protection holding extends to Title VII racial-discrimination claims because those claims share the same contextual foundation. They arise in a nation whose original sin is slavery, where some states sought to perpetuate white supremacy as recently as a half century ago, and where the vestiges of this iniquitous history persist in our workplaces and in other institutions of our society. The Equal Protection Clause and Title VII’s prohibition of racial discrimination in the workplace both operate to curtail the evil of racism inherent in antimiscegenation. That explains why Loving applies to Title VII racial-discrimination claims but is not a *369 warrant for reading sexual-orientation discrimination into the statute.
B
The majority also relies on cases involving sex stereotyping, most notably the Supreme Court’s decision in Price Water-house v. Hopkins. More specifically, my colleagues conclude that a claim of sexual-orientation discrimination is indistinguishable from a claim involving sex stereotyping. Majority Op. at pp. 345-47.1 disagree. Nothing in Hopkins altered the traditional understanding that sexual-orientation discrimination is a distinct type of discrimination and is not synonymous with sex discrimination.
As a preliminary matter, neither Hopkins nor any other decision of the Supreme Court establishes an independent cause of action for, or “doctrine” or “theory” of, “sex stereotyping.”[7] Hopkins held only that the presence of sex stereotyping by an employer “can certainly be evidence” of sex discrimination; to prove her case, the plaintiff must always prove that “the employer actually relied on her gender in making its decision.” 490 U.S. at 251, 109 S.Ct. 1775 (second emphasis added).
It’s also often overlooked that the lead opinion in Hopkins was a four-justice plurality, not a majority opinion. Id. at 231, 109 S.Ct. 1775. Two Justices concurred in the judgment only, and they said nothing about sex stereotyping as a “theory” of sex discrimination. Id. at 258-61, 109 S.Ct. 1775 (White, J., concurring in the judgment); id. at 261-79, 109 S.Ct. 1775 (O’Connor, J., concurring in the judgment). Here’s another point that’s often missed: Although the facts in Hopkins involved sex stereotyping, the actual legal issue dealt with the allocation of burdens of proof on the element of causation in a mixed-motives Title VII case. The plurality opinion made that clear in its very first paragraph: “We granted certiorari to resolve a conflict among the Courts of Appeals concerning the respective burdens of proof of a defendant and plaintiff in a suit under Title VII when it has been shown that an employment decision resulted from a mixture of legitimate and illegitimate motives.” Id. at 232, 109 S.Ct. 1775. The plurality devised a burden-shifting approach for use in mixed-motive cases. Id. at 258, 109 S.Ct. 1775. Justices White and O’Connor concurred in the judgment, each filing a separate opinion agreeing with the burden-shifting method but taking issue with the plurality’s discussion of the substantive standard of causation. Id. at 258-61, 109 S.Ct. 1775 (White, J., concurring in the judgment); id. at 261-79, 109 S.Ct. 1775 (O’Connor, J., concurring in the judgment).
Only a very short passage in the very long plurality opinion actually addresses the subject of sex stereotyping. The plurality simply accepted the district court’s factual finding that sex stereotyping played a role in Price Waterhouse’s decision to place Ann Hopkins’s bid for partnership on hold. Id. at 236-37,109 S.Ct. 1775 (describing the trial judge’s factual findings); see also id. at 251, 109 S.Ct. 1775 (“As to the existence of sex stereotyping in this case, we are not inclined to quarrel with the District Court’s conclusion that a number of the partners’ comments showed sex stereotyping at work.”). Regarding the legal significance of sex stereotyping as evidence of sex discrimination, the plurality had only this to say:
In saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of the decision what its *370 reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman. In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.
[[Image here]]
As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for “ ‘[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.’ ” Los Angeles Dept. of Water and Power v. Manhart, 435 U.S. 702, 707, n.13 [98 S.Ct. 1370, 55 L.Ed.2d 657] (1978), quoting Sprogis v. United Air Lines, Inc., 444 F.2d 1194, 1198 (7th Cir. 1971). An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22; out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind.
Id. at 250-51, 109 S.Ct. 1775 (footnote omitted). Nothing in this passage casts any doubt on the settled, long-understood distinction between sex discrimination and sexual-orientation discrimination.[8]
To put the matter plainly, heterosexuality is not a female stereotype; it is not a male stereotype; it is not a sex-specific stereotype at all. An employer who hires only heterosexual employees is neither assuming nor insisting that his female and male employees match a stereotype specific to their sex. He is instead insisting that his employees match the dominant sexual orientation regardless of their sex. Sexual-orientation discrimination does not classify people according to invidious or idiosyncratic male or female stereotypes. It does not spring from a sex-specific bias at all.
The point is easy to see if we take the question posed by the plurality opinion in Hopkins and map it onto this case. Hively suspects that the real reason Ivy Tech rejected her repeated applications for promotion is her sexual orientation. Assume for - the moment that her suspicion is correct. If we asked Ivy Tech “at the moment of the decision what its reasons were and if we received a truthful response,” id. at 250, 109 S.Ct. 1775, would it be reasonable to expect Ivy Tech to respond that it rejected her applications because she is a woman? No. If Ivy Tech responded truthfully, it would confess that its decisions were based on Hively’s sexual orientation, not her sex.
*371 So it’s a serious mistake to think that Hopkins either supports or requires a new interpretation of Title VII that equates sexual-orientation discrimination with sex discrimination. To the contrary, Hopkins does not even gesture in that direction. If the lower-court decisions involving “sex stereotyping” are a confusing hodgepodge — and I agree that they are — the confusion stems from an unfortunate tendency to read Hopkins for more than it’s worth. That’s not a reason to embed the confusion in circuit law.
C
Neither does Oncale compel or support today’s decision. Oncale held only that same-sex sexual harassment may, in an appropriate case, support a claim under Title VII provided that it “meets the statutory requirements.” 523 U.S. at 79-80, 118 S.Ct. 998. The Court reiterated that in all sex-discrimination cases, including sexual-harassment cases, “[t]he critical issue, Title VII’s text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.” Id. at 80, 118 S.Ct. 998 (quotation marks omitted).
The plaintiff in Oncale, a male roustabout on an oil platform in the Gulf of Mexico, alleged that his male coworkers regularly subjected him to “sex-related, humiliating” verbal and physical harassment. Id. at 77, 118 S.Ct. 998. The lower courts dismissed his claim based on an approach that categorically rejected same-sex harassment cases under Title VII. The Supreme Court reversed, holding that “nothing in Title VII necessarily bars a claim of discrimination ‘because of ... sex’ merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex.” Id. at 79,118 S.Ct. 998.
To sketch the circumstances in which evidence of same-sex harassment might support a claim of sex discrimination, the Court first explained how evidence of workplace harassment permits an inference of sex discrimination as a general matter. The Court explained, for example, that in an opposite-sex harassment cáse involving “explicit or implicit proposals of sexual .activity,” an inference of sex discrimination is easy to draw because “it is reasonable to assume those proposals would not have been made to someone of the same sex.” Id. at 80,118 S.Ct. 998. But the same is not true in a case involving same-sex harassment unless the evidence shows that the harasser is homosexual; only then would it be reasonable to infer that the victim was targeted because of his sex.[9] Id.
The Court offered two other examples of conduct that might support an inference of sex discrimination in a same-sex harassment case. The first is when a harasser uses “such sex-specific and derogatory terms” as to make it clear that he “is motivated by general hostility to the presence of [members of the same sex] in the workplace.” Id. The second is when the plaintiff offers “direct comparative evi *372 dence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.” Id. at 80-81, 118 S.Ct. 998. Because the record was undeveloped on these points, the Court remanded for further proceedings. Id. at 82, 118 S.Ct. 998.
In short, in authorizing claims of same-sex harassment as a theoretical matter, the Court carefully tethered all sexual-harassment claims to the statutory requirement that the plaintiff prove discrimination “because of sex.” Nothing in Oncale eroded the distinction between sex discrimination and sexual-orientation discrimination or opened the door to a new interpretation of Title VII.
Oncale was not a revolutionary decision. In contrast, today’s decision by the en banc court works a profound transformation of Title VII by any measure.
D
The majority also finds support for its decision in “the backdrop of the Supreme Court’s decisions ... in the area of broader discrimination on the basis of sexual orientation,” citing Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003); United States v. Windsor, — U.S. -, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013); and Obergefell v. Hodges, — U.S. —, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015). Majority Op. at pp. 349-50.
But the majority’s position is actually irreconcilable with these cases. First, Lawrence was decided solely under the Due Process Clause; it was not an equal-protection case. 539 U.S. at 564, 123 S.Ct. 2472. In the other cases, far from collapsing the well-understood distinction between sex discrimination and sexual-orientation discrimination, the Court actually preserved it. The Court assigned these two distinct forms of discrimination to different analytical categories for purposes of equal-protection scrutiny. If sex discrimination and sexual-orientation discrimination were really one and the same, then the Court would have applied the intermediate standard of scrutiny that governs judicial review of laws that classify people by sex. See United States v. Virginia, 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). It did not do so.
E
Finally, drawing especially on Obergefell, my colleagues worry that adhering to the long-settled interpretation of Title VII “creates ‘a paradoxical legal landscape in which a person can be married on Saturday and then fired on Monday for just that act.’” Majority Op. at p. 342 (quoting Hively v. Ivy Tech Cmty. Coll., 830 F.3d 698, 714 (7th Cir. 2016)). The concern is understandable, but my colleagues conflate the distinction between state action, which is subject to constitutional limits, and private action, which is regulated by statute. The Due Process and Equal Protection Clauses are constitutional restraints on government. Title VII is a statutory restraint on employers. The legal regimes differ accordingly. Any discrepancy is a matter for legislative, not judicial, correction.
[[Image here]]
If Kimberly Hively was denied a job because of her sexual orientation, she was treated unjustly. But Title VII does not provide a remedy for this kind of discrimination. The argument that it should must be addressed to Congress.
IV
This brings me to my last point, which concerns the principle of stare decisis. The general rule is that “store decisis ... has *373 ‘special force’ ” in the domain of statutory interpretation “for ‘Congress remains free to alter what we have done.’ ” John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 139, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008) (quoting Patterson v. McLean Credit Union, 491 U.S. 164, 172-73, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)). Special force or no, the foundational assumptions of the rule of law and due regard for the prudential virtues of stability, reliability, and predictability should inspire some caution here. A decision to upend settled precedent “demands special justification.” Michigan v. Bay Mills Indian Cmty., — U.S. -, 134 S.Ct. 2024, 2036, 188 L.Ed.2d 1071 (2014) (quoting Atizona v. Rumsey, 467 U.S. 203, 212, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984)). That “special justification” must at least begin with a convincing case that the challenged precedent is gravely wrong.
As I’ve explained, a convincing case has not been made. If more is needed, consider for a moment the next step in this litigation. When this case returns to the district court, it will not matter whether the evidence shows that Ivy Tech rejected Hively in favor of male applicants, female applicants, or a combination of men and women. If the facts show that Ivy Tech hired heterosexuals for the six full-time positions, then the community college may be found liable for discriminating against Hively because of her sex.[10] That will be so even if all six positions were filled by ivomen. Try explaining that to a jury.
[[Image here]]
In the end, today’s decision must be recognized for what it is: a new form of Title VII liability based on imputed motive, not actual motive. The majority’s new rule — that sexual-orientation discrimination = sex discrimination — imputes to the employer a motive that is not, and need not be, present in fact. Liability under this new “theory” of sex discrimination does not require the jury to find that the employer’s decision was actually motivated by the plaintiffs sex. That’s a necessary predicate for liability in all other sex-discrimination cases, but not here. Discrimination “because of sex” need not be found as a fact; instead, the court will impute the statutorily forbidden motive to the employer if the plaintiff proves discrimination “because of sexual orientation.”
[[Image here]]
This brings me back to where I started. The court’s new liability rule is entirely judge-made; it does not derive from the text of Title VII in any meaningful sense. The court has arrogated to itself the power to create a new protected category under Title VII. Common-law liability rules may judicially evolve in this way,[11] but statutory law is fundamentally different. Our constitutional structure requires us to respect the difference.
It’s understandable that the court is impatient to protect lesbians and gay men from workplace discrimination without waiting for Congress to act. Legislative change is arduous and can be slow to come. But we’re not authorized to amend Title VII by interpretation. The ordinary, reasonable, and fair meaning of sex discrimination as that term is used in Title VII does not include discrimination based on sexual orientation, a wholly different kind of discrimination. Because Title VII does not by its terms prohibit sexual-orien *374 tation discrimination, Hively’s case was properly dismissed. I respectfully dissent.

. He describes this method of statutory inter'pretation throughout his opinion and gives it the name "judicial interpretive updating” on page 353.

. Like my colleagues, I too decline to defer to the EEOC's decision in Baldwin v. Foxx, EEOC Appeal No. 0120133080, 2015 WL 4397641 (July 15, 2015). Majority Op. at p. 344. This is not a case about agency deference.

. The term “sexual orientation” does not appear in dictionaries at or around the time of Title VII’s enactment. According to the current definition, it is not synonymous with “sex.” Sexual Orientation, Oxford English Dictionary (2009 ed.) ("Originally: (the process of) orientation with respect to a sexual goal, potential mate, partner, etc. Later chiefly: a person’s sexual identity in relation to the gender to whom he or she is usually attracted; (broadly) the fact of being heterosexual, bisexual, or homosexual.”).

. A different subsection of the hate-crimes law imposes the same heightened penalty for *364 causing or attempting to cause bodily injury because of a person’s race. 18 U.S.C. § 249(a)(1).

. Judge Flaum’s concurrence offers a somewhat different way to think about sexual-orientation discrimination: "Fundamental to the definition of homosexuality is the sexual attraction to individuals of the ‘same sex.’ ... One cannot consider a person’s homosexuality without also accounting for their sex: doing so would render ‘same’ ... meaningless." Flaum, J., concurring, at p. 358. But an employer who categorically won’t hire homosexuals is not "accounting for” a job applicant's sex in the sense meant by antidiscrimination law; a hiring policy of "no homosexuals need apply” is gender blind. The next sentence in the analysis likewise doesn’t follow: "As such, discriminating against that employee because they are homosexual constitutes discriminating against an employee because of (A) the employee’s sex, and (B) their sexual attraction to individuals of the same sex." Id. Part (B) is true; part (A) is not. An employer who refuses to hire a lesbian applicant because she is a lesbian only "accounts for” her sex in the limited sense that he notices she is a woman. But that's not the object of the employer’s discriminatory intent, not even in part. Her sex isn’t a motivating factor for the employer's decision; the employer objects only to her sexual orientation. This attempt to conceptually split homosexuality into two parts — a person’s sex and his or her sexual attraction to persons of the same sex — doesn’t make sexual-orientation discrimination actionable as sex discrimination.

. Virginia's highest court had identified what it said were the state’s "legitimate purposes" for its miscegenation laws: " ‘to preserve the racial integrity of [the state’s] citizens,’ and to prevent 'the corruption of blood,' ‘a mongrel breed of citizens,’ and 'the obliteration of racial pride.’ ” Loving v. Virginia, 388 U.S. 1, 7, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (quoting Naim v. Naim, 197 Va. 80, 87 S.E.2d 749, 756 (1955)).- This, the Supreme Court said, was "obviously an endorsement of the doctrine of White Supremacy.” Id.

. Some lower courts use the phrase “gender nonconformity'' interchangeably with "sex stereotyping," but the Supreme Court has never used that term.

. The two cases cited in this passage of the plurality opinion were straightforward cases of sex discrimination. Manhart was a challenge to an employer’s policy that required female employees to make larger contributions to the employee pension fund than male employees. City of L.A., Dep’t of Water & Power v. Manhart, 435 U.S. 702, 704-06, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978). The Court noted that the employer's policy was not based on sex stereotypes but rested on actuarial generalizations that "the parties accept as unquestionably true: Women, as a class, do live longer than men.” Id. at 707, 98 S.Ct. 1370. Still, the Court held that requiring women to pay more into the fund than men was a plain case of sex discrimination. Id. at 707-10, 98 S.Ct. 1370.
Sprogis was a challenge to an airline’s rule that female flight attendants, but not male flight attendants, must be unmarried. Sprogis v. United Air Lines, Inc., 444 F.2d 1194, 1196 (7th Cir. 1971). This too was a straightforward case of sex discrimination. Id. at 1198 (holding that “it is clear that United has contravened [Title VII] by applying one standard for men and one for women”).

. Note that the Court’s focus is on the sexual orientation of the harasser, not the sexual orientation or attributes of the harassment victim. Some lower courts have missed this important point and mistakenly allowed same-sex harassment cases to proceed to the extent that the victim alleges he suffered harassment based on his supposed "gay behaviors.” This has predictably drawn an objection that the law should not distinguish between claims of discrimination for "acting gay” and claims of discrimination for "being gay.” Indeed it should not. On a proper understanding of the limits of Hopkins and On-cale, neither claim is actionable under Title VII. Both are claims of sexual-orientation discrimination, which is not covered by the statute.

. Unless, of course, Ivy Tech can show that Hively was less qualified than the applicants who were hired.

. Though the state supreme courts, not the federal courts, are empowered to adjust common-law rights and remedies.